644 F.2d 187
 UNITED STATES of America, Appellant
v.
CITY OF PHILADELPHIA; William J. Green, Mayor of
Philadelphia; W. Wilson Goode, Managing Director; Marvin E.
Aronson, M.D., Medical Examiner; G. Edward DeSeve, Director
of Finance; Morton B. Solomon, Police Commissioner; William
Devlin, Deputy Police Commissioner; Donald Gravatt, Deputy
Police Commissioner; Robert Armstrong, Chief Inspector,
Philadelphia Police Department (Internal Affairs Bureau);
Gregore Sambor, Chief Inspector, Philadelphia Police
Department (Training Bureau); Frank A. Scafidi, Chief
Inspector, Philadelphia Police Department (Detective Bureau
Headquarters Units); successor to position of Chief
Inspector, Philadelphia Police Department (Detective Bureau
Field Offices); successor to position of Chief Inspector,
Philadelphia Police Department (Staff Services Bureau);
Robert Wolfinger, Chief Inspector, Philadelphia Police
Department (Command Inspector); successor to functions of
Chief Inspector, Philadelphia Police Department (Patrol
Bureau South); successor to position of Chief Inspector,
Philadelphia Police Department (Command Inspector); John
Craig, Chief Inspector, Philadelphia Police Department
(Patrol Bureau North); John McHugh, Chief Inspector,
Philadelphia Police Department (Special Patrol Bureau);
Francis X. O'Shea, Chief Inspector, Philadelphia Police
Department (Community Relations Bureau); David Cordivari,
Captain of the Philadelphia Police Department; David Owens,
Superintendent of Prisons.
 No. 80-1348.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 7, 1980.
Decided Dec. 29, 1980.
Opinion Sur Denial of Petition for Rehearing Feb. 19, 1981.
 
 Peter F. Vaira, Jr., U. S. Atty., Drew S. Days, III, Asst. Atty. Gen. (argued), Brian K. Landsberg, David B. Marblestone, Martha A. Fleetwood, T. Alexander Aleinikoff, Attys., Dept. of Justice, Washington, D. C., for appellant, U. S.
 Alan J. Davis, City Sol. (argued), Mark A. Aronchick, Judith N. Dean, Deputy City Sol., Ralph J. Teti, Barbara Axelrod, Philadelphia, Pa., for appellees.
 Daniel J. Popeo, Paul D. Kamenar, Washington Legal Foundation, Washington, D. C., Stephen J. Zivic, Orie & Zivic, Pittsburgh, Pa., for amicus curiae, Washington Legal Foundation.
 Before ALDISERT, VAN DUSEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 The primary question in this appeal is whether the United States has implied authority to sue a city and its officials for an injunction against violations of the fourteenth amendment rights of individuals. The government argues that both the criminal provisions of the Civil Rights Acts of 1866 and 1870, 18 U.S.C. §§ 242 and 241, and the fourteenth amendment itself give rise to an implied right of action. We also must decide whether the government has stated a claim for relief under the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d, or the State and Local Fiscal Assistance Act of 1972 (the "Revenue Sharing Act"), 31 U.S.C. § 1242. In a pair of published opinions, the district court held that the Attorney General has no standing to advance the civil rights of third persons absent an express statutory grant of the necessary authority, and that the complaint did not allege claims under the two funding statutes with sufficient specificity; and accordingly it dismissed the complaint. United States v. City of Philadelphia, 482 F.Supp. 1248 and 1274 (E.D.Pa.1979). We affirm.
 
 I.
 
 2
 Because the case comes before this court on appeal from orders of the district court dismissing the complaint, we assume that all well-pleaded allegations of the complaint are true, and we set out the facts alleged in the light most favorable to the appellant.
 
 
 3
 The government's theory is that the appellees, the City of Philadelphia and numerous high-ranking officials of the City and its Police Department, have engaged in a pattern or practice of depriving persons of rights protected by the due process clause of the fourteenth amendment. The allegations of the complaint can be conveniently divided into two categories. First, it alleges that Philadelphia police officers have engaged in a widespread practice of violating the rights of persons they encounter on the streets and elsewhere in the city. In particular, it charges that officers have stopped automobiles and pedestrians without probable cause and physically abused or illegally arrested those who protested, arbitrarily closed public areas and responded to protests or resistance with physical abuse and unwarranted arrests, conducted illegal searches and seizures, detained persons without probable cause or for excessive periods, denied them access to counsel or to medical care while detained, physically abused arrested persons, extracted information and confessions by means of physical brutality, subjected individuals to verbal abuse (including racial slurs), filed unwarranted criminal charges, and engaged in unnecessary use of deadly force, such as shooting criminal suspects who offer no realistic threat to the safety of police officers or other persons.
 
 
 4
 Second, the United States alleges that the appellees have deliberately encouraged these illegal practices through the policies and procedures they have established for investigating complaints of illegal police activity. It charges that the appellees discourage victims of abuse from complaining, suppress evidence that inculpates police officers, accept implausible explanations of abusive conduct, harass complainants and witnesses, prematurely terminate investigations, compile reports that justify police officers' conduct regardless of actual circumstances, refuse to discipline police officers for known violations, and protect officers from outside investigations. It also charges various appellees with pursuing inadequate training practices, resulting in a pattern of police abuses, and with engaging in surveillance and harassment of critics of the police department.
 
 
 5
 The United States also alleges generally that some or all of the appellees have deliberately endeavored to encourage police violations of civil rights. It charges that these practices have been implemented with the intent and the effect of inflicting abuse disproportionately on black and Hispanic persons. And finally, it alleges that the foregoing practices have been implemented by police department personnel whose activities are funded in part by federal grants dispensed for the purpose of improving police procedures.
 
 
 6
 In its prayer for relief, the government asks for a declaration "that the acts, practices, policies and procedures alleged herein violate the Constitution and laws of the United States." It also asks the court to enjoin "the defendants, their agents, employees, successors in office, and all those acting in concert or participation with them" from engaging in the conduct alleged, "from failing or refusing to correct the effects" of that conduct, "from failing or refusing to ensure" that such conduct will not recur, "and from receiving, expending, or failing to make restitution for previously expended federal funds, unless and until defendants cease such acts, policies, practices, and procedures and correct their effects." Complaint, P 50, pp. at 34.
 
 II.
 
 7
 We first address the contention that the two criminal statutes, 18 U.S.C. §§ 241 and 242, implicitly grant the United States a right of action for injunctive relief. These statutes provide:
 
 
 8
 § 241. Conspiracy against rights of citizens
 
 
 9
 If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same ...
 
 
 10
 They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.
 
 
 11
 § 242. Deprivation of rights under color of law
 
 
 12
 Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if death results shall be subject to imprisonment for any term of years or for life.
 
 
 13
 The Attorney General relies principally upon Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), and Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), as authority for inferring a civil cause of action from the two criminal statutes. These and subsequent decisions of the Supreme Court, including Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), and Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), establish comprehensive standards for inferring rights of action. Under these decisions the "central inquiry" and the "ultimate question" is congressional intent. Touche Ross, 442 U.S. at 575, 578, 99 S.Ct. at 2489; see also Transamerica, 444 U.S. at 15-16, 99 S.Ct. at 244; Cannon, 441 U.S. at 688, 99 S.Ct. at 1953; Cort, 422 U.S. at 80-84, 95 S.Ct. at 2089; Wyandotte, 389 U.S. at 203-04, 88 S.Ct. at 386; Glus v. G. C. Murphy Co., 629 F.2d 248, 255 (3d Cir. 1980), cert. denied --- U.S. ----, 101 S.Ct. 351, 66 L.Ed.2d 212 (1980); id. at 262-63 (Sloviter, J., dissenting); National Sea Clammers Ass'n v. City of New York, 616 F.2d 1222, 1229 (3d Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 314, 66 L.Ed.2d 145 (1980).
 
 
 14
 We begin by rejecting the government's suggestion that the comprehensive analysis developed in the later Supreme Court opinions must be discarded in favor of its 1967 Wyandotte decision. The Attorney General argues that Wyandotte sets forth a different and more liberal test for recognition of implied rights of action in favor of the government, and that Wyandotte requires implication of the broad right to seek injunctions claimed here because there are no "other adequate means by which the United States can carry out its responsibility." Brief for Appellant at 18.
 
 
 15
 We reject the argument that Wyandotte established a different standard for inferring rights of action in favor of the government than the standard applicable to private litigants.[1] Wyandotte relied on "cases involving civil actions of private parties," 389 U.S. at 202, 88 S.Ct. at 386, and Cort v. Ash subsequently cited Wyandotte in developing further the test for inferring private rights of action. 422 U.S. at 79, 95 S.Ct. at 2088. More important, however, we think that Wyandotte represents merely one step in the development of the current standards for inferring rights of action and that the unrefined analysis employed in Wyandotte is no longer an accurate statement of the law. In Wyandotte the Supreme Court seemed to operate on the basis of a presumption that a civil damages remedy ordinarily should be inferred from a penal statute in the absence of "some persuasive indication" that "Congress must have intended the statutory remedies and procedures to be exclusive of all others." 389 U.S. at 200, 88 S.Ct. at 385. We would be blind to subsequent developments in a dynamic area of the law, however, if we failed to recognize that in recent years the Court has been far more reluctant to infer rights of action for silent statutes. See Touche Ross, 442 U.S. at 578, 99 S.Ct. at 2490. Instead of the presumption employed in Wyandotte, that statutory silence indicates congressional intent to create a cause of action by implication, the Court now adheres to the "elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." Transamerica, 444 U.S. at 19, 99 S.Ct. at 246.[2] See also Touche Ross, 442 U.S. at 574, 99 S.Ct. at 2488: "(W)e are extremely reluctant to imply a cause of action ... that is significantly broader than the remedy that Congress chose to provide." The analysis employed in the later cases is plainly inconsistent with the generous attitude of the Wyandotte opinion.[3] Therefore, we must reject the government's argument that Wyandotte would require us to infer a right of action from congressional silence and an absence of "adequate" remedies to redress the wrongs at issue.
 
 
 16
 Even if we were to accept the suggestion that a lack of adequate remedies requires recognition of an implied right of action, however, we could not find a federal right to sue for an injunction in this case. Congress has created numerous mechanisms for the redress of denials of due process. Persons denied constitutional rights may sue state officials for damages or injunctive relief under 42 U.S.C. §§ 1981, 1982, 1983, and 1985. Those suits may be filed as class actions under Rule 23, Fed.R.Civ.P., and prevailing litigants may recover attorneys' fees under 42 U.S.C. § 1988. A private litigant may obtain damages or an injunction against a city itself in certain situations. See Owen v. City of Independence, 445 U.S. 622 (1980); Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Private injunctive actions have been maintained successfully against "widespread" violations committed by local law enforcement officials. See, e. g., Allee v. Medrano, 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); Hague v. Committee for Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966) (in banc); see also Hairston v. Hutzler, 334 F.Supp. 251 (W.D.Pa.1971) (preliminary injunction), aff'd, 468 F.2d 621 (3d Cir. 1972) (per curiam). In Wyandotte, by contrast, the United States was forced by an emergency situation to remove a negligently sunken barge loaded with a dangerous cargo from the bottom of the Mississippi River, and it had no mechanism to recover its expenses other than a personal action against those responsible for the sinking.[4]
 
 
 17
 In addition, the United States can initiate criminal prosecutions under §§ 241 and 242, and it has successfully prosecuted Philadelphia police officers for unconstitutional conduct. See, e. g., United States v. Ellis, 595 F.2d 154 (3d Cir.), cert. denied, 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979). The Attorney General argues nonetheless that the criminal process is inadequate, because he would rather rely on a massive "single civil action" than to "continue repeated use of the criminal process." Brief for Appellant at 19. In short, although numerous express remedies exist, the Attorney General, stretching Wyandotte beyond recognition, invites this court to create another. We decline the invitation on this record.[5]
 
 III.
 
 18
 Nor are we persuaded that a different result is compelled by application of the Cort v. Ash analysis. That decision recognized four factors as relevant in determining whether a statute has implicitly created a private remedy:
 
 
 19
 First, is the plaintiff "one of the class for whose especial benefit the statute was enacted," that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
 
 
 20
 422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted).
 
 
 21
 For the purposes of our analysis we shall assume, without deciding, that the Cort v. Ash test is appropriate in this case, in which no private litigant claims monetary damages for the harm it has suffered from a statutory violation, but instead the United States seeks an injunction against what it perceives to be criminal activity.[6] We apply the Cort analysis in this case because the appellant advocates its use and because it clearly is no less generous a test than the appellant is entitled to have applied. This makes it unnecessary to decide whether a stricter standard should be applied to the federal government asserting an implied right to sue for an injunction than to a private litigant seeking damages. However, we apply the Cort test with the understanding that we must be reluctant to infer an additional statutory remedy that is significantly broader than those that Congress has chosen explicitly to provide. See part II, supra.
 
 A.
 
 22
 We now consider the first factor of Cort v. Ash: is the United States one of the class for whose especial benefit the statute was enacted? We answer this question in the negative. The government argues that it has a "duty" under §§ 241 and 242 to prevent violations of constitutional rights, and that this "duty" satisfies the first component of Cort. Brief for Appellant at 21. This "duty" analysis begs the fundamental question presented by this appeal. Although we might concede that in some abstract and metaphysical sense the government has a "duty" to its citizens to enforce the criminal statutes,[7] even that concession would leave us far from accepting the government's position. It may be also that § 5 of the fourteenth amendment would authorize Congress to impose on the Executive a generalized duty to prevent violations of the Constitution. Congress has not created such an obligation, however, either in §§ 241 and 242 or elsewhere, and this court does not have authority to impose the "duty" the government so eagerly seeks to assume.
 
 
 23
 Considering the first Cort factor in the context of its formulation, we find no support for the government's position. The United States is no part of a "class for whose especial benefit the statute was enacted"; i. e., the statute does not "create a federal right" in favor of the government. We conclude, therefore, that the first factor articulated in Cort v. Ash weighs heavily against implication of a right of action from §§ 241 and 242.
 
 B.
 
 24
 The second branch of the Cort test requires us to consider whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one. The government argues that this factor is neutral because the legislative history of the Reconstruction-era Civil Rights Acts does not reveal that Congress considered providing a civil remedy for the United States. Brief for Appellant at 21.
 
 
 25
 Between 1865 and 1871 Congress drafted the thirteenth, fourteenth, and fifteenth amendments and enacted a comprehensive statutory scheme for their enforcement. It gave extensive consideration to the creation of remedies to enforce the amendments. It provided several criminal and civil actions. In § 9 of the Civil Rights Act of 1866, 14 Stat. 29, repealed by § 122 of the Civil Rights Act of 1957, Pub.L.No. 85-315, 71 Stat. 637, it even authorized the President to call out the military "to prevent the violation and enforce the due execution of this Act." The Attorney General discusses the legislative history at length, but he fails to draw the obvious inference: that the extensive congressional consideration of the problem of enforcement and the comprehensive legislative program that it developed simply foreclose the possibility that it implicitly created an additional remedy without ever mentioning its existence in either the statutes or the debates.[8] There certainly is no evidence of congressional intent to create an additional remedy with the incredible breadth and scope of this one. The responsible answer to this question, and indeed, the overarching answer to this appeal, is that Congress never intended to grant a civil action to the Attorney General.
 
 
 26
 The same conclusion is supported by an examination of three express refusals of modern Congresses to grant the Executive general injunctive powers in this field, which not only demonstrates explicit congressional intent not to create the power claimed here by the Attorney General but also reveals an understanding, unanimously shared by members of Congress and Attorneys General, that no such power existed. The first attempt to give the Attorney General broad power to seek injunctions against violations of citizens' constitutional rights came in 1957. The House Judiciary Committee, responding to a proposal by Attorney General Herbert Brownell, Jr., drafted a bill amending 42 U.S.C. § 1985 to authorize the Attorney General to seek injunctions against violations of that section. See H.R.Rep.No. 291, 85th Cong., 1st Sess. 9-11 (1957), reprinted in (1957) U.S.Code Cong. & Ad.News, 1966, 1974-76. The proposed amendment to § 1985 was reported to the House as Part III of H.R. 6127, 85th Cong., 1st Sess. (1957), which was to become the Civil Rights Act of 1957. A majority of the Judiciary Committee recommended passage of H.R. 6127, noting that Part III would not "expand the rights presently protected," but that "the proposal does create a new remedy." H.R.Rep.No. 291, supra, at 10, (1957) U.S.Code Cong. & Ad.News at 1975. The Attorney General agreed, expressing the view that Part III was needed because under existing law "conspiracies to interfere with certain rights can be redressed only by a civil suit by the individual injured thereby." Id. at 15, (1957) U.S. Code Cong. & Ad.News at 1980.
 
 
 27
 A minority of the Judiciary Committee opposed passage of H.R. 6127, but they attacked Part III with special vigor, finding it "truly shocking" that the Attorney General would be "endowed with the privilege of setting up law through injunction." Id. at 45, (1957) U.S.Code Cong. & Ad.News at 2001 (Minority Report). The same concerns were expressed on the floor of the Senate.[9] After much debate, the opposition prevailed; the Senate amended the bill by deleting Title III[10] and the House passed the bill as amended.[11]
 
 
 28
 The Attorney General contends that Congress' rejection of Part III is irrelevant to the present case because the coverage of § 1985, which Part III would have amended, extends to "a single incident in which two persons conspire to harm a third person," while the coverage of an implied civil action under §§ 241 and 242 would be limited to conspiracies of a "widespread and continuing nature." Brief for Appellant at 31. Contrary to the government's contention, however, § 241 requires only a simple conspiracy to deny a citizen his rights.[12] Nothing in the Attorney General's theory would prevent the implication of lesser causes of action from §§ 241 and 242. No justification is offered for limiting the government's right of action to "widespread" violations. The statutory language is broad; an implied civil remedy necessarily would encompass the power to bring precisely those suits expressly rejected by Congress' refusal in 1957 to pass Part III.
 
 
 29
 In 1959, Congressman Celler introduced a more expansive version of Part III "to authorize the Attorney General to institute civil action(s) to enforce rights guaranteed by the Constitution."[13] A subcommittee of the House Judiciary Committee recommended that the Celler proposal be included in pending civil rights legislation, but the full Committee deleted it. H.R.Rep.No. 956, 86th Cong., 1st Sess. 3 (1959), reprinted in (1960) U.S.Code Cong. & Ad.News, 1939, 1940.
 
 
 30
 The Celler proposal also was offered on the floor of the Senate as an amendment to pending legislation. Supporters emphasized that the proposal would only create a new "remedy in a court of equity for acts which, under existing law, already are either the basis for criminal prosecutions or for damage suits," and argued that "(t)he addition of equitable procedures to the means of enforcing all these rights would mark a great advance in the law."[14] Senate opponents condemned the proposal because it contained no limitations or guidelines on the "vast, far-reaching power, which the Attorney General would have," the "power to proceed, at the expense and in the name of the Government, to enforce any so-called civil rights he could possibly read into the 14th amendment."[15] Senator Russell commented that it was "to the credit of the present Attorney General of the United States that he has said he did not want these powers."[16] Senator Ervin, who was regarded by his colleagues as a leading constitutional scholar,[17] argued that the Celler proposal "cannot be reconciled with a due regard for sound Federal-State relations" because it would furnish the Attorney General with "arbitrary power" to supervise
 
 
 31
 the functions and powers of State and local governments in vital areas of our life.
 
 
 32
 By resorting to civil actions and proceedings under Part III, the Attorney General could virtually convert Federal district courts into administrative branches of the executive department of the Federal Government for the management of elections, schools, and similar activities of a local nature.[18]
 
 
 33
 The proposed amendment was tabled by the Senate two days after it was offered.[19] Other efforts were made to revive the Celler proposal and to annex it to the Civil Rights Act of 1960[20] and other legislation, but they all failed.
 
 
 34
 The Attorney General argues that Congress' rejection of the Celler proposal is irrelevant to any discussion of an implied right of action arising out of §§ 241 and 242, because the proposal would only have enabled the government to sue to enforce the equal protection clause of the fourteenth amendment, while the present suit attacks widespread violations of due process. Brief for Appellant at 33. This argument depends on a non sequitur. Sections 241 and 242 are designed to prevent violations of all fourteenth amendment rights, including both due process and equal protection. See, e. g., United States v. Price, 383 U.S. 787, 800-06, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966); United States v. Guest, 383 U.S. 745, 753, 86 S.Ct. 1170, 1175, 16 L.Ed.2d 239 (1966). If a civil remedy were to be inferred from those statutes, it could not be limited to due process violations; and Congress' refusal to grant a limited power to enjoin equal protection violations cannot be considered an implicit endorsement of the greater power to sue to protect both equal protection and due process.
 
 
 35
 A provision similar to Part III and the Celler proposal was included in an early draft of the legislation that would become the Civil Rights Act of 1964, but it was deleted without reaching the floor of either house of Congress. Title III of H.R. 7152, 88th Cong., 1st Sess. (1963), as recommended by a subcommittee of the House Judiciary Committee, would have authorized the Attorney General to institute civil actions to enjoin the denial of any right, privilege, or immunity secured by the Constitution or laws of the United States. See H.R.Rep.No. 914, 88th Cong., 1st Sess. 17 (1963), reprinted in (1964) U.S.Code Cong. & Ad.News, 2391, 2392; see also id. at 41, (1964) U.S.Code Cong. & Ad.News at 2411 (additional views of Rep. Kastenmeier); id. at 81, (1964) U.S.Code Cong. & Ad.News at 2450 (Minority Report). Attorney General Robert F. Kennedy testified in opposition to the proposed Title III when he appeared before the Judiciary Committee in October, 1963:
 
 
 36
 Title III would extend to claimed violations of constitutional rights in State criminal proceedings or in book or movie censorship; disputes involving church-state relations; economic questions such as allegedly confiscatory ratemaking or the constitutional requirement of just compensation in land acquisition cases; the propriety of incarceration in a mental hospital; searches and seizures; and controversies involving freedom of worship, or speech, or of the press.
 
 
 37
 Obviously, the proposal injects Federal executive authority into some areas which are not its legitimate concern and vests the Attorney General with broad discretion in matters of great political and social concern.
 
 
 38
 Id. at 82, (1964) U.S.Code Cong. & Ad.News at 2450 (Minority Report). The Judiciary Committee deleted the proposed Title III and reported H.R. 7152 with a substitute designed to authorize the Attorney General under certain circumstances to sue to enjoin racial segregation in public facilities owned or operated by a state or local government. Id. at 22, (1964) U.S.Code Cong. & Ad.News at 2397. After further amendment, the substitute was enacted as Title III of the Civil Rights Act of 1964, Pub.L.No. 88-352, §§ 301-304, 78 Stat. 246 (codified at 42 U.S.C. §§ 2000b-2000b-3).
 
 
 39
 The history of Part III, the Celler proposal, and the proposed Title III demonstrates that Congress, even at the time it was taking dramatic and important steps toward the goal of protecting civil rights, was unwilling to grant the Attorney General more than a very limited power to interfere by injunction in the activities of state and local governments. Congress had three opportunities between 1957 and 1964 to authorize the Attorney General to bring lawsuits of the type that we now consider. It refused on each occasion because this authority would permit a dramatic and unnecessary shift of power from state and local governments to the Attorney General. The government now argues that this history is irrelevant to this case because two of the proposals were more limited than the authority it now claims. This view not only depends on a non sequitur, but also overlooks the fundamental objections raised by the opponents of each of the three proposals, that they would grant the Attorney General excessive authority over state and local governments.
 
 
 40
 We conclude, therefore, that the history of the Reconstruction era legislation reveals an implicit legislative intent, and that the modern history demonstrates an explicit intent, to deny the government the right of action asserted here.
 
 C.
 
 41
 What has been said in parts A and B is also applicable to an evaluation of the third Cort factor: whether the implied action is consistent with the underlying purposes of the legislative scheme. Congress has by explicit legislation established a comprehensive and detailed remedial structure for the protection of constitutional rights, and it has repeatedly refused to sanction federal executive intervention in local affairs in order to protect those rights. We think the underlying purposes of the legislative scheme are threefold: to permit the victims of constitutional violations to obtain redress, to provide for federal criminal prosecutions of serious constitutional violations when state criminal proceedings are ineffective for the purpose of deterring violations, and to strike an appropriate balance between the protection of individual rights from state infringement and protection of state and local governments from unnecessary federal interference. Permitting this action to proceed would upset that balance and therefore would be inconsistent with the underlying purposes of the statutory scheme.
 
 D.
 
 42
 The fourth test of Cort v. Ash requires us to consider whether the cause of action is one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law. We think the answer to this question is double-edged at best, and it certainly does not establish that Congress created an injunctive action in the government's favor when it enacted §§ 241 and 242.
 
 
 43
 The Attorney General argues that the federal government has a central role in protecting individuals from violations of the Constitution. This argument is facially appealing because the protection of federal rights clearly is a federal concern. However, the argument blurs the distinction between the roles of the federal courts, the federal legislature, and the federal executive. It also ignores the reverse side of the same coin: this lawsuit represents an attempt by the federal executive to intervene on a grand scale in the workings of a local government, an area that is manifestly the concern of the states and not the federal government. Federal courts must be "alert to adjust their remedies" to grant relief for invasions of federally protected rights, Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), but they are equally bound to give proper recognition to the principles of federalism that underlie the very structure of the Constitution, from which the federal courts and the federal Executive alike derive their authority.
 
 
 44
 This observation is reinforced by an examination of the fourth Cort factor in the context of its formulation. In Cort, the Supreme Court declined to create a new federal action in an area of corporate law traditionally subject to state control. 422 U.S. at 84-85, 95 S.Ct. at 2090. In Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963), cited in Cort in support of the fourth factor, the Supreme Court refused to find an implied federal action for abuse of the subpoena power by a federal officer, in part because damage actions against federal officials for abuses of power "are usually governed by local law." Id. at 652, 83 S.Ct. at 1445. This case, however, involves an attempt to impose federal authority in an area of much greater local concern, on a scale so massive that Cort and Wheeldin pale by comparison. The question here is whether the Attorney General has power to "sweep across the nation, thrusting himself into the policy-making machinery at every level of government from the village hall to the governor's mansion." United States v. City of Philadelphia, 482 F.Supp. at 1269. If the federal courts are bound by federalism concerns to leave to state courts issues of corporate governance and torts committed by federal officers, surely the Justice Department is equally bound to recognize strict limits to its power to intervene in the workings of the executive branch of local and state governments.
 
 E.
 
 45
 We conclude that the first three factors articulated in Cort v. Ash weigh heavily against the argument that when it enacted §§ 241 and 242 Congress by implication authorized the Attorney General to sue for injunctions against widespread violations of constitutional rights. Application of the fourth criterion does not yield as clear an answer as the first three, but we think that on balance the massive reach of the asserted federal power to interfere in the workings of local governments compels us to hold that it would be inappropriate to infer a right of action in the government's behalf. Even if the fourth factor weighed clearly in the government's favor, however, our obligation to recognize the primary role of Congress in enforcing the fourteenth amendment, see, e. g., Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), would require us to assign controlling weight to the unambiguous expressions of legislative intent revealed by application of the first three factors. See Touche Ross, 442 U.S. at 575-76, 99 S.Ct. at 2489. Therefore, we hold that the United States does not have implied statutory authority to sue a local government or its officials to enjoin violations of citizens' constitutional rights.
 
 IV.
 
 46
 The Attorney General's second theory for maintaining this lawsuit rests on the fourteenth amendment itself and on the President's duty under Article II, § 3 to "take Care that the Laws be faithfully executed." His premise is that because the national government is the "guarantor" of the rights of individuals, we must provide him with a remedy under the Constitution. Relying on Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), he argues that he has a right of action even though Congress has not exercised its power under § 5 of the fourteenth amendment to create one. Brief for Appellant at 39-42.
 
 
 47
 Carlson, Davis, and Bivens do not support the government's case. Those decisions rest on the principle that
 
 
 48
 the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights.
 
 
 49
 Davis, 442 U.S. at 242, 99 S.Ct. at 2275. See also Carlson, 446 U.S. at 18, 100 S.Ct. at 1472; Bivens, 403 U.S. at 397, 91 S.Ct. at 2005. That principle does not apply to the government's action in this case. The appellant is not a member of the class whose rights have been violated, but an officer of the federal government seeking to vindicate the constitutional rights of citizens. To allow this action to proceed under the "constitutional tort" theory of Bivens and its progeny would be to ignore, not merely to extend, the ratio decidendi of those decisions.
 
 
 50
 In addition, we note that the Supreme Court has held that a cause of action that otherwise would be recognized under the Bivens theory "may be defeated ... in two situations."
 
 
 51
 The first is when defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress." (Bivens,) 403 U.S., at 396, 91 S.Ct. at 2004; Davis v. Passman, 442 U.S. 228, 245, 99 S.Ct. 2264, 2276, 60 L.Ed.2d 846 (1979). The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective. Bivens, supra at 397, 91 S.Ct. at 2005; Davis v. Passman, 442 U.S., at 245-247, 99 S.Ct. at 2276.
 
 
 52
 Carlson, 446 U.S. at 18-19, 100 S.Ct. at 1472. The second test cannot be applied literally in this case, but we think it weighs against the government's action because Congress has enacted a comprehensive remedial scheme while deliberately refusing to create the right of action asserted here.[21] More important, however, and by itself sufficient to require rejection of the government's Bivens theory if it were valid otherwise, this case involves important "special factors counselling hesitation in the absence of affirmative action by Congress." Recognition of the asserted right of action would violate the constitutional scheme of separation of powers as exemplified and embodied in § 5 of the fourteenth amendment and would trample on important constitutional principles that underlie and give life to our federal system.
 
 
 53
 Section 5 of the fourteenth amendment confers on Congress, not on the Executive or the Judiciary, the "power to enforce, by appropriate legislation, the provisions of this article." The Supreme Court has repeatedly recognized the central role of Congress in establishing appropriate mechanisms to enforce the fourteenth amendment. See, e. g., Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); cf. South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (§ 2 of the fifteenth amendment). "It is not said the judicial power of the general government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed.... It is the power of Congress which has been enlarged." Ex parte Virginia, 100 U.S. 339, 345, 25 L.Ed. 676 (1879). Congress has exercised its power to "enforc(e) the prohibitions" on many occasions, but it has refused to grant the Executive and the Judiciary the authority that now is asserted. See part III B, supra. In our view, it would be entirely inappropriate for a federal court to overrule the explicit decisions of Congress not to increase federal executive and judicial authority over state and local governments in this manner.
 
 
 54
 In addition, the Supreme Court in the last decade has repeatedly recognized the importance of a proper respect for the independent roles of state and local governments in our federal system. See, e. g., Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). Judge Ditter wrote eloquently and persuasively for the court below that to permit this action to proceed "would be to vest an excessive and dangerous degree of power in the hands of the Attorney General":
 
 
 55
 The point is that the power which the Attorney General claims in this case is simply not compatible with the federal system of government envisioned by the Constitution. This power, in essence, would permit the Justice Department to bring a civil suit against any state or local administrative body merely because the Attorney General and his subordinates have determined that the defendant's operating policies and procedures violate any one of the civil rights guaranteed to citizens by the Constitution and laws of the United States. The purpose of such a lawsuit would be to obtain an injunction altering the challenged procedures. Quite literally, there would be no end to the local and state agencies, bureaus, offices, departments, or divisions whose day-to-day operating procedures could be challenged by suit, and changed by injunction.
 
 
 56
 It is well to remember that this case does not present an attack on brutality, per se. Rather, the challenge here is to policies, practices and procedures of the police department that are said to violate constitutional rights because they foster brutality. The conceivable variations on this lawsuit are practically infinite.
 
 
 57
 United States v. City of Philadelphia, 482 F.Supp. at 1268. We agree that judicial recognition of the asserted right of action would violate important principles of federalism and separation of powers.
 
 
 58
 The Attorney General's apparent (albeit oblique) response is that the asserted right of action will be limited to "exceptional" cases involving "widespread and continuing" violations, for which the remedies expressly provided are not "adequate." See Brief for Appellant at 31, 41-42, Reply Brief at 10. There are several problems with this argument. First, the asserted standards are so vague as to lack real content. Second, the fundamental objection is to permitting the federal executive to assume authority over state and local governments. If that power is once granted, it will take an active judiciary indeed to confine it within principled limits. Third, even if the government's authority could be confined to "exceptional" cases, judicial assertion of the power to compel drastic and far-reaching changes in local governments would be inconsistent with a proper division of power in a federal system.
 
 
 59
 We hold, therefore, that the fourteenth amendment does not implicitly authorize the United States to sue to enjoin violations of its substantive prohibitions.
 
 V.
 
 60
 Our conclusion, that neither §§ 241 and 242 nor the fourteenth amendment create in the government a right to maintain this action for an injunction, is bolstered by an additional consideration: the longstanding and uniform agreement of all concerned that no such right of action has ever existed. Our discussion of the modern legislative history in part III B, supra, demonstrates that neither Attorneys General nor Congress between 1956 and 1964 believed that either Congress or the Constitution had created this power sub silentio. Those officials did not act out a meaningless charade, debating whether to create what they believed already existed, but in a serious and responsible manner decided for reasons of constitutional principle and sound public policy not to create new federal authority over state and local governments.
 
 
 61
 The same understanding, that the United States may not sue to enjoin violations of individuals' fourteenth amendment rights without specific statutory authority, has been shared by almost every court that has had the opportunity to pass on the question. In United States v. Mattson, 600 F.2d 1295 (9th Cir. 1979), and in United States v. Solomon, 563 F.2d 1121 (4th Cir. 1977), the courts of appeals affirmed district court decisions and held that the Attorney General may not sue to vindicate the constitutional rights of institutionalized mentally retarded citizens without express statutory authority. In United States v. Elrod, No. 76-C-4768 (N.D.Ill. May 16, 1978), rev'd on other grounds, 627 F.2d 813 (7th Cir. 1980), the district court held that the Attorney General had no standing to sue to protect the constitutional rights of local prisoners. The Court of Appeals reversed and remanded because intervening legislation, the Civil Rights of Institutionalized Persons Act, Pub.L.No. 96-247, § 3, 94 Stat. 350 (1980), provided explicit statutory authority for the action.[22] Three Justices of the Supreme Court have expressed their opinion that the United States does not have authority under either the fourteenth amendment or §§ 241 and 242 to seek an injunction against state corrections officials. Estelle v. Justice, 426 U.S. 925, 928-29, 96 S.Ct. 2637, 2638, 49 L.Ed.2d 380 (1976) (Rehnquist, J., joined by Burger, C. J., and Powell, J., dissenting from denial of petition for certiorari). To our knowledge, the only decision that has held squarely that the United States may sue to enjoin "large-scale denials of due process" is a much criticized district court decision, United States v. Brand Jewelers, Inc., 318 F.Supp. 1293, 1299-1300 (S.D.N.Y.1970). We agree with the numerous critics of that decision,[23] and we think it is significant that the United States does not rely on it here.
 
 
 62
 We note also that as recently as two years ago, only eight months before the complaint initiating this action was filed, Assistant Attorney General Drew S. Days, III, head of the Civil Rights Division, who argued for the government in this case, publicly stated his opinion that §§ 241 and 242 do not give the Justice Department authority to seek injunctions against violations of civil rights. Addressing the shortcomings of criminal prosecutions under §§ 241 and 242 as a means of deterring police brutality, Mr. Days stated:
 
 
 63
 A prosecution for police misconduct does not address itself to the activities of a police department as such or of a city administration per se, but only to the actions of one or more officers in a given circumstance, framed by and limited to the wording of the criminal indictment. Moreover, criminal prosecutions are reactive litigations involving only the calling to account of individuals who have already engaged in acts of misconduct. Any conscious effort to anticipate instances of police misconduct and head them off before they occur must arise from some other source than the Federal criminal code.
 
 
 64
 Police Practices and the Preservation of Civil Rights, A Consultation Sponsored by the United States Commission on Civil Rights, Washington, D.C., December 12-13, 1978, at 141 (emphasis added). We agree with Mr. Days' 1978 statement that the criminal code does not authorize the Justice Department to seek prospective relief. Cf. United States v. Cooper Corp., 312 U.S. 600, 614, 61 S.Ct. 742, 748, 85 L.Ed. 1071 (1941) ("the conviction that no right to sue had been given the Government, rather than a supine neglect to resort to an available remedy, seems to us the true explanation" for the failure of the United States to seek treble damages under the Sherman Act until fifty years after its enactment).
 
 
 65
 In sum, the Attorney General argues that he possesses implied authority under the Civil Rights Acts and under the fourteenth amendment to request far-reaching mandatory injunctions, notwithstanding three separate refusals of Congress to grant him this authority and a widely-shared understanding that the authority does not exist. He also has looked to the courts, and applications similar to this have been rejected in the fourth, seventh, and ninth circuits. Unabashed, he has continued to shop for a forum that will lend its ear. He will not find it here.
 
 
 66
 We think that what he asks is unnecessary, because other avenues of relief are available. What he seeks is a grant of unbridled authority that does violence to the delicate balance of power among the legislative, executive, and judicial branches of government. What he requests strikes at the heart of fundamental comity between federal and state governments. Finally, what is sought government by injunction is anathematic to the American judicial tradition, succinctly and eloquently described by Justice Marshall:
 
 
 67
 The Constitution provides that Congress shall make laws, the President execute laws, and courts interpret laws.... It (does) not provide for government by injunction in which the courts and the Executive Branch can "make law" without regard to the action of Congress. It may be more convenient for the Executive Branch if it need only convince a judge to prohibit conduct rather than ask the Congress to pass a law, and it may be more convenient to enforce a contempt order than to seek a criminal conviction in a jury trial. Moreover, it may be considered politically wise to get a court to share the responsibility for arresting those who the Executive Branch has probable cause to believe are violating the law. But convenience and political considerations of the moment do not justify a basic departure from the principles of our system of government.
 
 
 68
 New York Times Co. v. United States, 403 U.S. 713, 742-43, 91 S.Ct. 2140, 2155, 29 L.Ed.2d 822 (1971) (Marshall, J., concurring) (citation omitted).
 
 VI.
 
 69
 Appellant's remaining claims rest on allegations of racial discrimination in the administration of certain federally funded programs.[24] The district court held that the Attorney General has explicit statutory authority to bring suit against discriminatory administration of federal funds, 482 F.Supp. at 1259, but it subsequently granted appellees' motion to dismiss these claims for failure to plead with sufficient specificity. Id. at 1274.[25] Although the district court offered it "a reasonable opportunity to file an amended complaint," id. at 1279, the government declined the offer and moved for entry of final judgment, stating that "it is in the interest of the United States not to amend the complaint." App. at 154. We now must determine whether the district court erred in requiring a more specific complaint.
 
 
 70
 Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." It must provide the defendants with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); see generally C.A. Wright, Handbook of the Law of Federal Courts § 68 (3d ed. 1976). The rule is well established in this circuit that a civil rights complaint that relies on vague and conclusory allegations does not provide "fair notice" and will not survive a motion to dismiss.[26] We require a modest degree of factual specificity in civil rights complaints because we are concerned that
 
 
 71
 (a) substantial number of these cases are frivolous or should be litigated in the State courts; they all cause defendants public officials, policemen and citizens alike considerable expense, vexation and perhaps unfounded notoriety. It is an important public policy to weed out the frivolous and insubstantial cases at an early stage in the litigation, and still keep the doors of the federal courts open to legitimate claims.
 
 
 72
 Valley v. Maule, 297 F.Supp. 958, 960-61 (D.Conn.1968) (quoted with approval in Rotolo v. Borough of Charleroi, 532 F.2d 920, 922 (3d Cir. 1976), and in Kauffman v. Moss, 420 F.2d 1270, 1276 n.15 (3d Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970)). This reasoning demands that the rule be applied here. Like a civil action under 42 U.S.C. § 1983, this action seeks relief against a local government and its officials for the protection of citizens' constitutional rights; and like a § 1983 action, this action threatens massive federal interference with a local government. We agree with the conclusion of the district court
 
 
 73
 that this case presents an enormous potential for causing "public officials, policemen and citizens alike considerable expense, vexation and perhaps unfounded notoriety." Quite naturally, this case has generated a great deal of publicity. At stake are the reputations of numerous individual defendants, some prominent and some obscure, as well as the public image of the entire Philadelphia Police Department. Surely, such a case demands specificity of pleading. If the charges contained in the complaint are frivolous, they should be dismissed at the earliest possible stage. On the other hand, if there is genuine substance to these serious allegations of racial discrimination, the public interest requires a speedy and expeditious adjudication. Specificity of pleading is essential if these important goals are to be served.
 
 
 74
 482 F.Supp. at 1278 (footnote omitted). We believe also that in this case a specific pleading requirement will help to implement the congressional policy of forbidding federal "direction, supervision, or control" of local police departments.[27] Elimination of frivolous and insubstantial claims[28] at the pleading stage in cases of this nature will protect local police officials from being intimidated by the threat of burdensome discovery, and a more specific complaint will enable the district court to protect local governments' files from overbroad and irrelevant inquiries.
 
 
 75
 We also agree with the district court that a requirement of specificity under these circumstances works no hardship on the plaintiff. "This is no more than the courts of the Third Circuit require of a prisoner, uncounselled and unlearned in the law with no investigators and only the most modest of legal resources, who brings a civil rights action." Id. at 1278-79. This complaint was signed by six government attorneys, including the Attorney General himself, so the government has a formidable arsenal of legal armament at its disposal. Moreover, it is public knowledge that the government's complaint was preceded by an eight-month investigation. Id. at 1271, 1279.
 
 
 76
 We conclude finally that the complaint was correctly dismissed. Its allegations of racial discrimination can only be characterized as vague, conclusory, and inconsistent.[29] It fails to identify the specific "program or activity" of the Police Department which has expended federal funds in an illegal manner.[30] It does not in any manner allege facts showing a nexus between acts of racial discrimination and the named individual defendants[31] or between the expenditure of federal funds and incidents of police abuse, nor does it indicate how the city qua city practiced discrimination. We hold, therefore, that the complaint neither provides "fair notice of what the plaintiff's claim is and the grounds upon which it rests" nor "show(s) that the pleader is entitled to relief" against any defendant.
 
 
 77
 The United States argues that its complaint should not have been dismissed because it has supplied specific factual information in response to defense interrogatories. Brief for Appellant at 43-44, 46-47. It is true that one function of discovery in federal court litigation is to narrow the issues for trial. However, one function of complaints, as we have noted, is to give defendants fair notice of plaintiffs' claims and the grounds on which they rest and to show why the plaintiff is entitled to relief. In a civil rights case, seeking federal relief against agencies and officers of state and local governments, we require the pleadings to provide more specific notice, for several reasons. Experience has demonstrated the great potential for frivolous and insubstantial suits, brought for purposes of political harassment,[32] to cause defendants to suffer "expense, vexation and perhaps unfounded notoriety." In addition, fundamental principles of comity and federalism demand that federal court intervention in the orderly procedures of state and local governments be limited to serious cases presenting some realistic basis for believing that the plaintiff will be able to produce evidence of violations of federal law. These principles have even greater weight in this case because federal court intervention is sought by the federal Executive even though Congress has explicitly stated its determination to place strict limits on federal executive interference with local police departments. Before being permitted to proceed to discovery, with its attendant potential for disrupting local government activities, the United States should have filed a complaint providing fair notice that there were substantial issues of unlawful racial discrimination related to particular federal programs, practiced by the City and the named defendants, for which a federal court could provide a remedy.
 
 
 78
 In sum, we will hold the Attorney General to the same pleading requirements we demand of a private litigant who brings an action under the Civil Rights Acts. The appellant failed to satisfy these standards, and it deliberately rejected an opportunity to amend its complaint. We find no error in the district court's disposition of this case.
 
 VII.
 
 79
 The judgment of the district court will be affirmed in all respects.
 
 SUR PETITION FOR REHEARING
 
 80
 Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.*
 
 
 81
 ALDISERT, Circuit Judge.
 
 
 82
 The petition for rehearing filed by Appellant in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 83
 SEITZ, Chief Judge and GIBBONS, A. LEON HIGGINBOTHAM, J., and SLOVITER, Circuit Judges, would grant the petition for rehearing.
 
 
 84
 GIBBONS, Circuit Judge, dissenting from an order denying rehearing.
 
 
 85
 Rule 35 of the Federal Rules of Appellate Procedure provides that rehearing by the court in banc "will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceedings involve a question of exceptional importance." This case, in which the United States petitions for rehearing of a panel decision affirming the dismissal of its complaint, more clearly meets both criteria of Rule 35 than any of those which we have heard in banc in the eleven years of my service on this court. The panel decision is plainly inconsistent with an in banc opinion of this court filed little over a year ago, and with two prior panel opinions, one of them written by the very author of the opinion of which the United States seeks reconsideration. Moreover, it imposes on the United States a new and totally unprecedented requirement of fact rather than notice pleading in an action in which the Department of Justice seeks to enforce the provisions of a federal statute enacted pursuant to Congressional spending power. Finally, it is inconsistent with a long line of authority in the Supreme Court respecting the authority of the Department of Justice to conduct litigation in the public interest. It is flabbergasting, considering the trivial uses to which Rule 35 has been put in this court, that five votes are unavailable to authorize consideration of this case. Not only is it a case which amply satisfies the criteria of Rule 35, but the panel decision and the decisions in the district court are patently wrong.
 
 I. FACTS
 
 86
 This suit grows out of an eight-month Justice Department investigation into police brutality in Philadelphia. Following the failure of private plaintiffs in Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), to convince the Supreme Court of a sufficient factual nexus between particular acts of brutality and official collusion in condoning the conduct of or obstructing the disciplining of police officers, and system-wide deprivations of civil rights, the Justice Department undertook to establish that connection. Its investigations into police files of citizen complaints, and review of internal police department training and disciplinary procedures revealed a pervasive pattern or practice of verbal abuse (often involving racial epithets), physical abuse, false arrests, compounding of charges to cover up false arrests or to discourage the filing of complaints, illegal searches and seizures, and unlawful detainments.
 
 
 87
 As detailed in the government's complaint and replies to defendants' interrogatories, the investigation also discovered inadequate training in the use of fire arms. The training did not attempt to discourage officers from using deadly force, with the result that innocent bystanders and fleeing persons were too often shot, 29 of them in the back. The government's investigation uncovered 290 complaints by citizens that they had been shot. The police department did not afford adequate psychological training to help officers deal with stress situations and to screen out officers with abusive tendencies. Officers were also inadequately trained to recognize victims of diabetic, epileptic and other disease-related seizures, with the result that persons in need of medical care were often locked up without medication and sometimes physically abused.
 
 
 88
 The internal investigative and disciplinary procedures, or rather lack of them, were an especial subject of investigation. The Justice Department found that the police department pressured citizen complainants and witnesses to take lie detector tests, but did not impose the tests on police officers. Statements from witnesses would often be taken in the presence of the allegedly abusive officer. Police officers would offer to drop charges if the arrestee withdrew or agreed not to file a complaint. The police department would often accept the officer's explanation of his conduct, and would compile reports justifying the officer's conduct. Compilers of these reports would discuss them with the directors of the police department internal affairs bureau, and would often alter the reports to suit the protective views of the directors. Moreover, despite complaints of brutality filed against police officers, who may or may not have been internally investigated, these officers would nonetheless receive commendations and promotions. The Justice Department further found that the police department harassed citizen critics of the police by surveillance and false arrests. Police officers critical of department practices would also be harassed.
 
 II. THE DISTRICT COURT'S OPINIONS
 
 89
 The district court issued two opinions, one dismissing the bulk of the government's claims for lack of standing, the other dismissing the remainder of the complaint for failure to plead discrimination in the administration of federally funded programs with sufficient factual specificity.
 
 A. Standing
 
 90
 In its first opinion, reported at 482 F.Supp. 1248 (E.D.Pa.1979), the district court concluded the Attorney General lacked authority, express or implied, statutory or constitutional, to initiate the greater part of its suit seeking declaratory and injunctive relief against a pattern or practice of civil rights violations.[1] The court reviewed the legislative history of the Civil Rights Acts of 1957, 1960 and 1964, in which amendments explicitly authorizing the Attorney General to initiate suits for injunctions were proposed but never incorporated in the bills' final versions. Relying, in the absence of direction from the Third Circuit, on decisions from the Fourth and Ninth Circuits, the court concluded that congressional failure explicitly to authorize executive branch suits for injunctions meant Congress intended to prohibit the suit.
 
 
 91
 The district court rejected the Attorney General's argument that 28 U.S.C. § 518(b), authorizing his Department to conduct in federal court any case in which the United States is interested, afforded explicit statutory authority for this suit. The court found that statute a "mere housekeeping provision," 482 F.Supp. at 1258, that could not have been intended to confer broad power to vindicate the United States' interests.
 
 
 92
 The court went on to reject any implied statutory authority to initiate the action. The Attorney General relied primarily on 18 U.S.C. §§ 241, 242, the criminal counterparts of 42 U.S.C. §§ 1983, 1985. While facially these statutes authorize no more than criminal prosecutions against civil rights violators, the government maintained that there is no effective remedy other than the Attorney General's injunctive action to prevent wide-spread civil rights violations by Philadelphia police and city officials. Lack of an effective alternate remedy, and the statutory scheme of 18 U.S.C. §§ 241, 242 and 42 U.S.C. §§ 1983, 1985, the Attorney General argued, implied statutory authority for the suit. The district court rejected these assertions, noting that effective alternative remedies through private actions existed.
 
 
 93
 The district court also rejected the Attorney General's claim of inherent executive authority to bring the suit. The court found unpersuasive the government's analogy of an implied constitutional right of action by the government from Supreme Court decisions affording private litigants an implied constitutional claim. It also dismissed the Attorney General's contention that he has inherent constitutional authority to sue to protect the United States' interests, including power to remove burdens on interstate commerce and to protect constitutional and statutory rights. The court found no authority in In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895) (discussed infra, Part V) for the government's arguments. That case, in which the Supreme Court announced a broad Executive Branch right and duty to sue to protect the public interest, was, according to the court, limited to its facts of dire nationwide emergency. The government's allegations of burdens on interstate commerce in Philadelphia were said to be of much less magnitude than the burdens proved in Debs. The court declined to follow the ruling of the Southern District of New York in United States v. Brand Jewelers, 318 F.Supp. 1293 (S.D.N.Y.1970) (discussed infra Part V), which had upheld the Attorney General's standing to sue to enjoin wide-spread deprivations of due process.
 
 
 94
 The court also rejected the government's argument that it had standing to sue as parens patriae to protect the health and welfare of its citizens. It held that remedy to be available only when no private alternative existed. Because private enforcement alternatives were available, the court found no merit in this last argument.
 
 
 95
 The district judge then embarked on a policy discussion of the impropriety, and indeed, danger of the government's suit. In a discussion reminiscent of South Carolina's attitude toward federal revenue officers,[2] he stated that "the power which the Attorney General claims in this case simply is not compatible with the federal system of government envisioned by the Constitution," 482 F.Supp. at 1268. He envisioned "legions of lawyer-bureaucrats," id. at 1269, dispatched to reconnoiter and to rampage "the policy making machinery at every level of government from the village hall to the governor's mansion," id. He suggested that permitting the government's suit would encourage the Executive to take the law into its own hands, and in effect, to rewrite congressional enactments to satisfy its power-hungry tastes. Finally, the district judge argued that not only did the government's suit threaten potential executive abuse, it had in fact already resulted in abuse. The judge believed the Justice Department's tactics of investigation and prosecution of the suit catered to the press and jeopardized the reputations of former Mayor Rizzo and several high police department officials. It did not seem to occur to the court that a trial on the merits might vindicate the ex-mayor's and the police officials' reputations.
 
 B. Pleading
 
 96
 In its second opinion, reported at 482 F.Supp. 1274 (E.D.Pa.1979), the district court held the government's complaint failed to meet the "well established (rule) in this Circuit that complaints in civil rights cases must be pleaded with factual specificity." Id. at 1275. The court found the complaint contained "naked allegations" of racial discrimination in the administration of federally funded police department activities, but failed to include the requisite supporting factual averments. Moreover, the court found, the complaint was self-contradictory in its allegations of racial discrimination.
 
 III. THE PROCEDURE BELOW
 
 97
 Some flavor of the attitude with which the district court received the United States' complaint may be gleaned from the court's dismissal of most of the charges without oral argument, pursuant to Rule 12(b), even though an answer had been filed, interrogatories had been served and comprehensively answered, and the defendants never made a Rule 12(b) motion to dismiss, 482 F.Supp. at 1252, n.1. The decision dismissing most of the complaint left pending a claim by the government for the enforcement of federal funding statutes. 42 U.S.C. § 2000d; 42 U.S.C. § 3766(c); 42 U.S.C. § 6727(b) and 31 U.S.C. § 1242(g). In disposing of that claim, after answer, and without reference to the contents of the government's over 800 pages of answers to interrogatories, the district court, acknowledging that a Rule 12(b) motion was in those circumstances untimely, but again acting sua sponte, granted a Rule 12(c) motion for judgment on the pleadings which the defendants never made. Since the district court proceeded sua sponte on both motions, the United States was never afforded the opportunity to argue that its answers to interrogatories cured any defects in its complaint. The panel opinion, viewing the government's complaint with the same distaste, never even mentions the highly unusual manner in which the district court proceeded.
 
 IV. PLEADING
 
 98
 The district court's dismissal of the government's complaint for failure to allege with sufficient factual specificity its allegations of race discrimination in the administration of federally funded police activities disregards this Circuit's decision in Rhodes v. Robinson, 612 F.2d 766 (3d Cir. 1979), directing that trial courts should not limit their consideration to the complaint when later submissions may allege the requisite facts. More importantly, the district court failed to recognize that this Circuit has applied the requirement of fact pleading in civil rights claims only against private litigants. The policy basis of that requirement, to weed out frivolous claims of irresponsible litigants, has little, if any, application to suits brought by the United States Attorney General. Finally, the district court's application of a fact pleading requirement to Justice Department pattern-or-practice suits would result in the submission of elephantine complaints, and would disembowel the Federal Rules of Civil Procedure 8(a)(2) requirement of a "short and plain statement of the claim."
 
 A. Later Submissions
 
 99
 In Rhodes v. Robinson, a panel of this Circuit stated.
 
 
 100
 The purpose of the requirement of specificity in civil rights complaints is to weed out frivolous and insubstantial claims.... This purpose is not well served by limiting consideration to the complaint and ignoring later submissions that provide the necessary specificity.
 
 
 101
 612 F.2d at 727.
 
 
 102
 The government's 35 page complaint is more than a "short and plain statement." Fed.R.Civ.P. 8(a). In fifty paragraphs and many subparagraphs it comprehensively describes a pattern or practice of Philadelphia police and city officials, in the physically and verbally abusive conduct of police officers, in the inadequate, and deliberately discouraging complaints procedure, and in the failure adequately to train and discipline police officers. The complaint also alleges that these practices have a disproportionate impact, and in some instances are designed to impact disproportionately, on Blacks and Hispanics. The government's complaint details an overall procedural picture. It does not, however, specify particular names, times, places, and events. In response to defendants' interrogatories, the government filed a formidable set of answers totalling 836 pages. These answers afford overwhelming specifics as to names, dates, places, and particular acts. Many of the answers point the defendants to hundreds of citizen complaints in the police department's files.[3] While many of the government's answers graphically describe instances of police brutality without dividing the victims into categories by race, other answers do afford more than adequate support for the government's allegations of race discrimination.
 
 
 103
 For example, in a 79-page list of persons subjected to the practice of "cover charging" that is, the filing of additional charges by the police in order to discourage the filing of citizen complaints or in order to cover up illegal arrests[4] 196 of the 284 events listed, or 69%, involve Blacks or Hispanics. (Not all of the persons are identified by race. Only seven of the 284 cover-charging events resulted in sentencings.) Each event lists name, date, charges, and disposition. See Third Reply to Defendants' First Set of Interrogatories, pages 1H-79H.
 
 
 104
 The government also recited specific events of physical abuse, illegal searches and seizures, and unlawful detainment. Each category of violation received several paragraphs detailing the name of the victim, the date, place, and particular facts. These paragraphs did not, on the whole, identify the victim's race. At the end of each set of paragraphs, however, the government provided a list of names and dates, and in most cases, race. These names were drawn from police files of citizens who had filed complaints with the department. The police files contain specific descriptions of each event. A review of these lists reveals a highly disproportionate impact on Blacks and Hispanics.
 
 
 105
 Total Approximate
 Number of Number of Percentage of
 Complainants Black and Black and
 Identified by Hispanic Hispanic
 Race Complaina- Complainants
 nts *
 ------------- ---------- -------------
Type of Complaint filed
Persons charged with assaulting
 or resisting police officer
 complaining
 of physical abuse while
 in police custody(a) .......................... 76 50 66%
Arrestees and prisoners complaining
 of physical abuse while in
 police custody(b) ............................. 96 59 61.5%
Complaints of physical abuse to
 extract confessions(c) ........................ 47 27 57.5%
Complaints of illegal searches
 and seizures(d) ............................... 15 11 73.3%
Complaints of unlawful
 detainment(e) ................................. 26 10 61.5%
Complaints of general physical
 abuse(f) ..................................... 143 89 62.2%
 
 
 
 (a)See Third Reply to Defendants' First Set of Interrogatories
 at 111-17.
(b)Id. at 118-30.
(c)Id. at 131-32.
(d)Id. at 139-41.
(e)Id. at 142-44.
(f)Id. at 146-57.
 
 
 *
 According to the 1979 Statistical Abstract, published by the Bureau of the
 Census and providing figures from the 1970 census, the Black population of
 Philadellphia was 33.6%. Other minorities totaled less than one percent. The
 1980 figures are not currently available.
 It should be clear from the foregoing that the government's later submissions afforded ample specificity of racially discriminatory impact. The callous disregard of the government's answers not only ill-serves the purpose of "weeding out insubstantial claims," but given the considerable substantiation the government provided in its answers, seems a willful flouting of this court's Rhodes v. Robinson ruling, and a barely-masked contempt for the civil rights guarantees the government seeks to enforce through its suit under the federal funding statutes.
 
 
 B
 Civil Rights Pleading Policy
 This Circuit's rule requiring fact pleading in civil rights complaints may be marginally defensible as a means of weeding out frivolous complaints brought by irresponsible, and perhaps unstable, litigants.[5] But that policy reason, whatever its merit when applied to a private civil rights plaintiff, has no application to a complaint brought on behalf of the United States by a cabinet-level officer. In none of the cases in which this Circuit has applied the fact-pleading rule has the federal government been the plaintiff. The simplistic application of the rule to the federal government affords no justification for this extension. However distasteful some judges may find its attempt to enforce the civil rights statutes, the federal government cannot be denominated an irresponsible, unstable, frivolous or over litigious plaintiff.
 In United States v. Gustin-Bacon Division, Certain-Teed Products Corp., 426 F.2d 539 (10th Cir.), cert. denied, 400 U.S. 832, 91 S.Ct. 63, 27 L.Ed.2d 63 (1970), the Tenth Circuit rejected defendant's claim that a complaint filed by the federal government alleging violations of 42 U.S.C. § 2000e-6(a) must contain facts pleaded with greater specificity and detail than required by Fed.R.Civ.P. 8. The court held that unless Congress specifically provided otherwise, the Federal Rules of Civil Procedure govern the government's pleading requirements in an action pursuant to a statutory grant of authority.
 Rule 8 of the Federal Rules of Civil Procedure was originally designed to circumvent the morass caused by the code pleading requirement of pleading facts constituting the cause of action.... To reinstate this type of pleading, even in the limited circumstances here involved, is to directly contradict the spirit and purpose of Rule 8(a) and the general concept of modern federal pleading. We find no suggestion in the Civil Rights Act of 1964 nor in the debates prior to its enactment which supports (defendants') contention that Congress intended to require the Attorney General to revert to a detailed pleading of evidentiary matters.
 426 F.2d at 542.
 Like the statutes at issue in Gustin-Bacon, the federal funding statutes under which the Attorney General sues in this case, 42 U.S.C.A. § 3789d (1979), 42 U.S.C. §§ 2000d, 3766, 6727 (1976), and 31 U.S.C. § 1242 (1976), contain no fact-pleading requirement. Without such a requirement, the liberal notice pleading standard of the Federal Rules and of Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), should govern the Attorney General's complaint. Under that standard, unless "no set of facts" could prove the Attorney General's allegations, the complaint should not be dismissed.
 
 
 C
 Effect of Application of a Fact Pleading Rule to Justice Department Pattern or Practice Suits
 The complaint filed in this case was hardly insubstantial. Far from setting out the kind of scanty claims the fact pleading rule condemns, the government's hefty complaint made out a thorough description of the alleged pattern and practices of the Philadelphia Police Department and city officials depriving Philadelphians of their civil rights. For example, paragraph 31 and its eight subparagraphs describe the kinds of physical harassment to which street police officers allegedly subject Philadelphians. Paragraph 35 and its five subparagraphs describe the internal procedures through which the Department discourages citizen complaints of police abuse and insulates officers from disciplinary proceedings. Paragraph 36 and its eight subparagraphs detail ways in which the Department's Homicide Division protects its officers from criminal investigation. Similar examples abound. In a pattern or practice suit, scores or hundreds of specific events may underlie each allegation of a procedure purportedly violating the civil rights laws. To require the government to specify the underlying facts in its complaint would result in complaints hundreds of pages long. In this case, the factual specifications provided in the government's answers to defendants' interrogatories exceeded 800 pages. Had they been incorporated in the complaint, that document would have approached if not exceeded one thousand pages. A complaint of such mammoth dimensions makes a mockery of Rule 8(a). Had the government submitted such a complaint, the district court would most likely have dismissed it for prolixity.[6]
 Among the many egregious consequences of the panel's affirmance of the district court's pleading ruling, the total disregard of this court's decision in Rhodes v. Robinson and the application without policy justification of a fact-pleading rule to the United States Attorney General pale by comparison with the effect of an imposition of fact-pleading requirements to a Justice Department pattern-or-practice suit. Not only does such a rule eviscerate the notice pleading standard which Congress has shown no desire to alter with respect to government suits under civil rights statutes, see United States v. Gustin-Bacon, supra, but its practical consequences create an immeasurable burden on the Justice Department and on the federal courts. Can this Circuit really mean to impose on the federal government a requirement that it file a multi-volume complaint in order to obtain a hearing on the merits of a pattern or practice suit in a Title VII case, for example?[7] The panel opinion on this aspect of the case is so thoroughly inconsistent, not only with our prior decisions, but with any possibly relevant public policies, that it cries out for reconsideration by the court in banc.
 
 
 V
 SOURCES OF EXECUTIVE AUTHORITY TO BRING SUIT
 Article II section 3 of the Constitution charges the Executive to "take care that the Laws be faithfully executed." Independent of any explicit statutory grant of authority, provided Congress has not expressly limited its authority, the Executive has the inherent constitutional power and duty to enforce constitutional and statutory rights by resort to the courts. When Federal courts have upheld executive standing without explicit congressional authority, they have looked to other provisions of the Constitution, such as the commerce clause[8] and the fourteenth amendment,[9] and to a general statutory scheme defining federal rights but lacking the specific remedy of executive suit.[10] In addition, 28 U.S.C. § 518(b) affords the Attorney General statutory authority to "conduct and argue any case in a court of the United States in which the United States is interested." The Supreme Court has held that this statute confers on the Executive general authority to initiate suits "to safeguard national interests."[11] Moreover, the Supreme Court has held that the Executive's general constitutional duty to protect the public welfare "is often of itself sufficient to give it standing in court."[12]
 
 
 A
 review of the caselaw construing executive authority to bring suit helps set this suit in context. Prior cases show that the district court's arguments for denying standing because of congressional inaction to afford explicit standing or because of a threat of abuse of executive power have already been rehearsed and rejected
 From the beginning of the nineteenth century, the Supreme Court has recognized the nonstatutory authority of the executive to sue to protect the United States' contractual and proprietary interests. See, e. g., Dugan v. United States, 16 U.S. (3 Wheat.) 172, 4 L.Ed. 362 (1818); United States v. Buford, 28 U.S. (3 Pet.) 12, 7 L.Ed. 585 (1830); United States v. Tingey, 30 U.S. (5 Pet.) 115, 8 L.Ed. 66 (1831); Benton v. Woolsey, 37 U.S. (12 Pet.) 27, 9 L.Ed. 987 (1838); United States v. Gear, 44 U.S. (3 How.) 120, 11 L.Ed. 523 (1845); Cotton v. United States, 52 U.S. (11 How.) 229, 13 L.Ed. 675 (1850); United States v. Hughes, 52 U.S. (11 How.) 552, 13 L.Ed. 809 (1850); Hughes v. United States, 71 U.S. (4 Wall) 232, 18 L.Ed. 303 (1866).
 After the civil war, with the creation of the Justice Department, An Act to Establish the Department of Justice, 16 Stat. 162 ch. 150 (June 22, 1870), the scope of the Attorney General's statutory and nonstatutory authority to conduct litigation in which the United States had an interest expanded. The 1870 Justice Department Act, part of the Reconstruction Congress' efforts to implement and to secure enforcement of the 13th, 14th and 15th amendments, see generally, H. Cummings & C. McFarland, Federal Justice, 218-249 (1937), broadened the Attorney General's authority to appear in federal court to present the interests of the United States.[13]
 The 1870 Justice Department Act added the provision now found at 28 U.S.C. § 518(b)
 When the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so.
 
 
 [16]
 Stat. 162, ch. 150 § 5 (1870). Whether this statute, along with other Reconstruction Era enactments, see, e. g., 17 Stat. 13 ch. 22 § 3 (1871), now at 10 U.S.C. 333 (part of the Ku Klux Klan Act, authorizing the executive to use military or "any other means" to enforce federal law), in effect creates explicit congressional authority for the executive to seek declaratory or injunctive relief in civil rights cases, is perhaps debatable. But cf. United States v. California, 332 U.S. 19, 26-28, 67 S.Ct. 1658, 1662, 91 L.Ed. 1889 (1946) (discussed infra). Nonetheless, in the vast expansion of federal law and of the activities of federal lawyers that occurred after the Civil War, the nature of suits brought by the Attorney General without explicit statutory authority also widened. The Justice Department Act, if it did not automatically grant standing (a latter-day concept with which the legislators of 1870, accustomed to practice under the Process Act, would hardly be familiar), did authorize the Attorney General, or his designees, to sue in the lower federal courts. See United States v. San Jacinto Tin Co., 125 U.S. 273, 278-79, 8 S.Ct. 850, 853, 31 L.Ed. 747 (1888)
 In United States v. San Jacinto Tin Co., supra, the Attorney General sued to revoke a fraudulently obtained land patent. Although the United States had a proprietary interest in the action, for if the patent were revoked the land would have reverted to the United States, the Court's concerns focused more on protecting the integrity of the land patents scheme than on any pecuniary interest of the United States. Thus, although the Court spoke of the rights of the United States as analogous to those of a private litigant interested in the suit's subject matter, it also declared:
 (I)n short, if there does not appear any obligation on the part of the United States to the public, or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances.
 125 U.S. at 286, 8 S.Ct. at 857. The analogy to private litigants is in fact imperfect, for as the Court recognized, and was to elaborate further in Bell Telephone, the Executive has a duty to the public, which no private litigant suing to enforce his property interests has.
 It is important to note that this early non-statutory action afforded the Supreme Court the opportunity to reflect on, and to reject, the argument that executive resort to the courts without congressional authority threatened the balance of power among the coordinate branches of the federal government.
 We are not insensible to the enormous power and its capacity for evil thus reposed in that department of the government. Since the title to all of the land in more than half of the States and Territories of the Union depends upon patents from the government of the United States, it is to be seen what a vast power is confided to the officer who may order the institution of suits to set aside every one of these patents; and if the doctrine that the United States in bringing such actions is not controlled by any statute of limitations, or governed by the rule concerning laches be sound, of which we express no opinion at present, then the evil which may result would seem to be endless as well as enormous. But it has often been said that the fact that the exercise of power may be abused is no sufficient reason for denying its existence, and if restrictions are to be placed upon the exercise of this authority by the Attorney General, it is for the legislative body which created the office to enact them.
 125 U.S. at 284, 8 S.Ct. at 856.
 In United States v. American Bell Telephone Co., 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888), the Supreme Court expanded on the public protection theme announced in San Jacinto. In this case, the United States had no pecuniary interest, for the Attorney General was suing, without Congressional authority, to revoke a fraudulently obtained inventor's patent. Unlike revocation of a land patent, revocation of an inventor's patent would not return property to the United States. Nonetheless the Court held,
 The essence of the right of the United States to interfere in the present case is its obligation to protect the public from the monopoly of the patent which was procured by fraud, and it would be difficult to find language more aptly used to include this in the class of cases which are not excluded from the jurisdiction of the court by want of interest in the government of the United States.
 128 U.S. at 367-68, 9 S.Ct. at 97.
 One commentator has suggested that the Executive's obligation to protect the public interest in the abstract did not itself afford the Attorney General standing:
 But in concluding that there was a public interest at stake entitling the Executive to bring suit, the Court did not rely on a mere assertion that such was the case. Rather, it inferred the existence of an interest from the extensive congressional activity in the patent area; and it permitted the Executive to bring suit to protect that public interest despite the absence of express statutory authority to do so because of the constitutional responsibility of the Executive to effectuate a congressionally established scheme.
 Note, Nonstatutory Executive Authority to Bring Suit, 85 Harv.L.Rev. 1566, 1568 (1972). In effect, the Executive was filling in the interstices of a statutory scheme whose policy was clear. Congress' failure specifically to provide for this mode of enforcing patent policy did not prevent the Executive from taking its own steps to effect the general statutory goal of awarding a monopoly only to those inventions meeting the statutory criteria of unique originality.[14] Even accepting this more narrow reading of United States v. American Bell Telephone, this case falls within it, for there is a pervasive federal statutory policy protecting civil rights.
 In In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895), the Attorney General sought an injunction against the activities of Eugene V. Debs and other leaders of the Pullman railway workers. Several grounds were available to confirm the Executive's nonstatutory right to bring the suit. The Pullman strike prevented the passage of the mails through Chicago. The unanimous Court observed that the United States' proprietary interest in the mails would afford a nonstatutory right of action. 158 U.S. at 583-84, 15 S.Ct. at 905-906. The Court continued, however:
 We do not care to place our decision upon this ground alone. Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court.
 Id. at 584, 15 S.Ct. at 906. The Court reviewed its decisions in San Jacinto and Bell Telephone, concluding:
 It is obvious from these decisions that while it is not the province of the government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet, whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the Constitution are entrusted to the care of the Nation, and concerning which the Nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties.
 Id. at 586, 15 S.Ct. at 907.
 Thus, the Attorney General's nonstatutory right of action derived from the constitutional duty to protect the public from injury to the general welfare. The Pullman strike impeded commerce, obstructed the highways, and in effect, represented a nuisance whose removal the executive was obliged to effect, 158 U.S. at 599, 15 S.Ct. at 912.[15] While one might attempt to limit Debs to its facts of extreme crisis, or to suggest that extensive congressional regulation of interstate commerce made Debs, like Bell Telephone, an example of filling in remedial interstices, see Note, Nonstatutory Executive Authority to Bring Suit, 85 Harv.L.Rev. at 1569-70, the Court's express language goes well beyond these interpretations. While in 1895 there might have been differences in the Court as to the appropriate standard of conduct,[16] even then the Court would not have suggested that the interests protected by the thirteenth, fourteenth and fifteenth amendments were less "entrusted to the care of the nation" than were those protected by the commerce clause.
 In United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1946), the dispute concerned legal title to oil-rich land under three-mile belt off the California shore. California maintained the Attorney General had no standing to assert the United States' claim. Invoking the inertia-as-law principle on which the district court in this case relied, California argued
 that Congress has for a long period of years acted in such a way as to manifest a clear policy that the states, not the Federal Government, have legal title to the land under the three-mile belt. Although Congress has not expressly declared such a policy, (the Court) is asked to imply it from certain conduct of Congress and other governmental agencies charged with responsibilities concerning the national domain. And, in effect, (the Court is) asked to infer that Congress has by implication amended its long-existing statutes which grant the Attorney General broad powers to institute and maintain court proceedings in order to safeguard national interests.
 332 U.S. at 27, 67 S.Ct. at 1662.
 The "long-existing statutes" to which the Court referred are the portions of the 1870 Justice Department Act creating the Department, and authorizing the Attorney General to assert the United States' interests in federal court, now at 28 U.S.C. §§ 501, 503 & 518. United States v. California thus found clear statutory authority for the government's suit, despite the absence of more explicit authority to institute the particular suit at hand. In reply to California's standing contentions, the Court held:
 (N)o act of Congress has amended the statutes which impose on the Attorney General the authority and the duty to protect the Government's interests through the courts. That Congress twice failed to grant the Attorney General specific authority to file suit against California, is not a sufficient basis upon which to rest a restriction of the Attorney General's statutory authority.
 Id. at 27-28, 67 S.Ct. at 1662-1663 (citations omitted). The Court's examination of the legislative history of Congress' two failures to grant express standing to the Executive to initiate a suit to confirm the United States' title, 332 U.S. at 28 n.4, 67 S.Ct. at 1663 n.4, did not lead the Court to conclude that Congressional failure to authorize the suit therefore meant Congress forbade the action. The broad statutory authority invested in the Attorney General to argue the interests of the United States supplied ample standing.[17]
 The Supreme Court's treatment of Executive standing thus outlines four grounds of the Attorney General's authority to initiate suit despite the absence of express congressional directive to bring particular kinds of actions. 28 U.S.C. § 518 affords a general statutory source of standing when the United States' interests, and particularly its federal sovereign interests, are at stake. Moreover, without referring to that statute, the Court has declared a general federal right to protect Government property, and to supply an additional remedy to effect a general statutory scheme, as well as a constitutional obligation to protect the public welfare.[18]
 More recently, the civil rights movement of the late fifties and early sixties also occasioned nonstatutory executive resort to the federal courts. Courts in the Fifth Circuit, addressing the activities of the Ku Klux Klan against the "freedom riders," and segregation in bus and airline terminals, applied the Debs precedent to hold that the Executive had a nonstatutory right of action to sue to enjoin burdens on interstate commerce. See, e. g., United States v. U. S. Klans, 194 F.Supp. 897 (M.D.Ala.1961) (Johnson, J.); United States v. City of Montgomery, 201 F.Supp. 590 (M.D.Ala.1962) (Johnson, J.); United States v. Lassiter, 203 F.Supp. 20 (W.D.La.) (3 judge court), aff'd per curiam, 371 U.S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47 (1962); United States v. City of Shreveport, 210 F.Supp. 36 (W.D.La.1962); United States v. City of Jackson, 318 F.2d 1 (5th Cir. 1963) (Wisdom, J.); United States v. Original Knights of the KKK, 250 F.Supp. 330 (E.D.La.1965) (3 judge court) (Wisdom, J.); Fla. East Coast Ry. v. United States, 348 F.2d 682 (5th Cir. 1965). See also United States v. Lynd, 301 F.2d 818 (5th Cir. 1962) (without discussion, permitting the Attorney General to bring a nonstatutory suit for an injunction to restrain Voting Rights Act violations). While some of these decisions find statutory standing under interstate commerce acts and under the Federal Aviation Act, all explicitly also ground the Attorney General's right of action in the duty to enforce the commerce clause of the Constitution.[19] It must be acknowledged that between 1877 and the late fifties, instances of Executive Branch civil actions to enforcement of rights protected by the post Civil War amendments cannot be found. The reason, however, is not lack of standing. Any kind of Executive Branch enforcement of those amendments was almost non-existent. The question was not lack of standing, but lack of initiative.[20]
 In United States v. Brand Jewelers, Inc., 318 F.Supp. 1293 (S.D.N.Y.1970), Judge Marvin Frankel, relying on Debs and its Fifth Circuit progeny, held that the Attorney General had nonstatutory authority to sue to enjoin the New York "sewer service" practice. Brand Jewelers and similar operations sold on credit to impecunious customers, then filed a suit to collect, employing process servers who never delivered the summons but filed an affidavit of service. Armed with the affidavit, Brand would obtain a state court default judgment, and would garnish the wages of the hapless and unnotified defendants. In addition to the burden on interstate commerce this practice engendered. Judge Frankel found the practice resulted in "large-scale denials of due process," 318 F.Supp. at 1300. The court held "the United States may maintain this action because it has standing to sue to end widespread deprivation (i. e. deprivation affecting many people) of property through 'state action' without due process of law," id. at 1299. The court found the Debs principle provided
 no acceptable basis in principle for distinguishing today the authority of the Attorney General to protect against large-scale burdens on interstate commerce from his authority to protect against large-scale denials of due process.
 Id. at 1300.
 Judge Frankel reviewed and rejected defendants' argument that the Executive's nonstatutory suit threatened abuse, and that Congress' failure to confer standing meant Congress intended to deny the Attorney General a right of action.
 Defendants warn that the power claimed by the Government in this case is "overwhelming" and "awesome" a power that "can readily become a terrible engine of oppression." This is a little hyperbolic to describe the peaceable submission of the United States that it should be permitted to sue in court and pray for judgment on behalf of thousands of people alleged to have been cheated in ways that deny their constitutional rights and burden the nation's commerce. At the same time, defendants have a point when they urge that it is no small matter for anyone to have the resources of the Federal Government drawn up against him in a lawsuit. In the end, however, the potential of imaginable horrors is not a pointedly useful test. Possible abuses by the Attorney General are subject to the control of Congress. See United States v. San Jacinto Tin Co., supra, 125 U.S. 273 at 284, 8 S.Ct. 850, 31 L.Ed. 747. Still more immediately, the whole matter is in court, where the Attorney General submits for judicial judgment all questions of propriety, possible excess, scope and limit.
 
 
 [318]
 F.Supp. at 1299 (Citation omitted)
 Judge Frankel continued:
 It is said that Congress has on occasion given to the Attorney General power to sue for enforcement of individual rights, but has declined to grant by statute the standing now claimed: expressio unius, as the saying runs, est exclusio alterius. But the range and effectiveness of that canon are in general somewhat limited. It was available, mutatis mutandis, in Debs and other cases in the line. Cf. United States v. Bell Telephone Co., supra, 128 U.S. 315 at 334, 336, 371-373, 9 S.Ct. 90, 32 L.Ed. 450. The failure of Congress to take positive action, sometimes a matter of moment, is hardly the equivalent of a negation. It seems especially dubious to fashion a prohibition from Congressional inaction in a case like this one, where both Congress and the courts are conceded by the executive to have veto powers, on the issue of standing as well as on the merits.
 
 
 [318]
 F.Supp. at 1300[21]
 The following year, in New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), the Supreme Court heard and ruled on the Executive's nonstatutory action seeking an injunction against publication of the "Pentagon Papers." In his dissent, Justice Harlan argued the Court should have faced the question whether "the Attorney General is authorized to bring these suits in the name of the United States," 403 U.S. at 753, 91 S.Ct. at 2161. The rest of the court assumed the United States could sue.
 VI. THE EXECUTIVE AS PLAINTIFF-INTERVENOR AND AS PARTY IN CHARGE OF THE CONDUCT OF THE SUIT
 In addition to initiating suits to protect the public from "large-scale deprivations of due process," burdens on interstate commerce, and fraud, and to assert its federal sovereign interests, the Executive has successfully intervened in civil rights actions. In Faubus v. United States, 254 F.2d 797 (8th Cir. 1958), the court invited the United States' nonstatutorily authorized intervention to secure the enforcement of school desegregation orders in Little Rock, Arkansas, when the governor of that state had called out the local national guard to prevent the attendance of black children in white schools. In Bush v. Orleans Parish School Bd., 191 F.Supp. 871 (E.D.La.) (3 judge court), aff'd per curiam, 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed.2d 1249 (1961), the Court invited the Attorney General's participation as amicus curiae. The court had already declared plaintiffs' right to attend desegregated schools, but the injunction had yet to be enforced. The court rejected defendants' argument that congressional failure, in the Civil Rights Acts of 1957 and 1960, expressly to permit the United States to initiate civil rights actions, denied the Attorney General standing to intervene, 191 F.Supp. at 876-77. In footnote the court further observed:
 There is some doubt whether the mere failure of Congress to expressly authorize the Attorney General to prosecute desegregation suits strips him of that power, if the United States has an interest in the matter. See United States v. State of California, 332 U.S. 19, 28, 67 S.Ct. 1658, 1663, 91 L.Ed. 1889, in which the Supreme Court rejected a similar argument saying: "That Congress twice failed to grant the Attorney General specific authority to file suit against California, is not a sufficient basis upon which to rest a restriction of the Attorney General's statutory authority."
 
 
 [191]
 F.Supp. at 877 n.14
 Moreover, the Court held:
 The absence of specific statutory authority is of itself no obstacle, for it is well settled that there is no such prerequisite to the appearance of the United States before its own courts. United States v. San Jacinto Tin Co., 125 U.S. 273, 278-285, 8 S.Ct. 850, 31 L.Ed. 747; Kern River Co. v. United States, 257 U.S. 147, 155, 42 S.Ct. 60, 66 L.Ed. 175; Sanitary Dist. of Chicago v. United States, 266 U.S. 405, 426, 45 S.Ct. 176, 69 L.Ed. 352. Nor do the statutes governing the Attorney General's participation in court proceedings contain a prohibition. See 5 U.S.C.A. §§ 309, 316 (now 28 U.S.C. §§ 501, 503, 518).
 
 
 [191]
 F.Supp. at 878
 This circuit, en banc, has recently affirmed the Attorney General's nonstatutory right of intervention in civil rights cases. In Halderman v. Pennhurst State School and Hospital, 612 F.2d 84 (3d Cir. 1979), rev'd and remanded on other grounds, --- U.S. ----, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)this court reviewed and rejected the Fourth Circuit's decision in United States v. Solomon, 563 F.2d 1121 (4th Cir. 1977), which had denied the Attorney General standing to initiate an action to enjoin civil rights violations in a state hospital for the mentally retarded. The Fourth Circuit had held that Congress' failure to afford the executive an express right of action, and the Supreme Court's decision in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), compelled a refusal to permit the Attorney General's suit. This court held:
 We do not find persuasive the Solomon court's analogy between President Truman's nonjudicial seizure of the steel mills by military force and a judicial proceeding to obtain injunctive relief enforcing legislative policies in aid of the mentally retarded. There is all the difference in the world for separation of powers purposes between a naked exercise of executive power and executive branch resort to the judicial branch for relief which Congress has not expressly prohibited. The President is, after all, charged with the responsibility to "take Care that the Laws be faithfully executed ..." U.S.Const. art. II, § 3. When, in an effort to do so, he resorts to an Article III court under a recognized grant of federal jurisdiction such as 28 U.S.C. § 1345, and that court finds no legislative prohibition against that resort, the lawsuit cannot reasonably be seen as an invasion of the powers of Congress. Before relief can be given in such a suit, one branch, the judiciary, must agree that it is authorized by the law promulgated by a third branch. If the judiciary has, in an individual case, misconstrued the law, Congress can, constitutional pronouncements aside, change the rule for the future. If Congress wishes to withhold from the executive branch the civil remedies available under the Federal Rules of Civil Procedure, it can by specific legislation say so. Thus, we find unconvincing the separation of powers argument invoked by the Solomon court to reject executive branch enforcement of federal law.
 612 F.2d at 91-92. Six members of the court joined in the Halderman opinion, including one who now joins in the panel opinion expressly approving the Solomon case, which little more than a year ago we expressly disapproved! Even the dissenters in Halderman did not dissent from that part of the opinion. Although this court suggested the rationale for permitting executive intervention and the rationale for permitting executive initiation of a civil rights action might be the same, in Halderman we were not called upon to decide the latter question.
 This Circuit has also construed the statutes authorizing the Attorney General's appearance in a pending federal court suit "to attend to the interests of the United States," 28 U.S.C. § 517, and to "conduct and to argue any case in a court of the United States in which the United States is interested," 28 U.S.C. § 518, to permit the Attorney General to represent a private citizen in a civil damages action implicating the United States' interests. Brawer v. Horowitz, 535 F.2d 830 (3d Cir. 1976) (Aldisert, J.). In Brawer v. Horowitz, the government undertook the defense representation of a criminal informer whose testimony at a prior trial resulted in plaintiffs' conviction. Plaintiffs claimed the United States lacked legal authority to represent him, and that the United States had no interest in his defense. Pointing to 28 U.S.C. § 517, the court dismissed the first argument as "approach(ing) the frivolous," 535 F.2d at 834. As for the government's "interest" required under 28 U.S.C. § 518, the court held:
 The government should not "interfere in any mere matter of private controversy." In re Debs, 158 U.S. 564, 586, 15 S.Ct. 900, 907, 39 L.Ed. 1092. On the other hand, it plays a legitimate role where the matters involved "affect the public at large" and "are entrusted to the care of the nation." Ibid.
 535 F.2d at 836. The court found the United States' interest in enforcing the criminal laws, including the protection of informers, met the Debs standard.[22]
 Thus statutory and Third Circuit caselaw authority present the following picture: when a private action implicates the United States' interests, the Attorney General may 1) intervene; and 2) take over the conduct of the litigation with respect to issues involving the United States' interests. It is difficult to perceive a qualitatively different "threat" to separation of powers, or to local autonomy, when the Attorney General intervenes and conducts the injunctive action, and when he initiates the action. Clearly, had the United States joined a class or even individual private plaintiffs in this action, the Attorney General's standing would be indisputable. To hold the absence of private plaintiffs denies the Attorney General standing seems an exercise in piercing the substance to uncover the form.[23]
 The district court did not hold that the United States lacked the requisite "interest" under 28 U.S.C. § 518. Rather, it construed the statute as "merely a housekeeping provision which pertains to the internal organization of the federal government." 482 F.Supp. at 1258. The district judge felt "such an innocuous statute," id., could not confer general statutory authority to sue to protect the United States' interests. This court's construction of § 518 in Brawer v. Horowitz, however, controverts the district court's "mere housekeeping" interpretation. This circuit has explicitly followed Debs in construing that provision. The United States' "interest" comprehends "matters ... 'affect(ing) the public at large' and ... 'entrusted to the care of the nation.' " Had this court found section 518 merely concerned internal Justice Department organization, it could not have advanced its broad reading of the Attorney General's statutory authority, nor sustained its holding in Brawer. Because the United States clearly has the requisite "interest" in preventing the wide-scale deprivation of due process and burdens on interstate commerce the government's complaint, alleges, it certainly has standing to bring this action.[24]VII. FEDERALISM
 The district court went on at some fulminating length about federal interference in local government.[25] The district judge found it most unseemly that the United States would seek by injunction to enforce the civil rights of residents of Philadelphia. In what might be termed an expression of the "dog pound theory," the judge envisioned massive and unwarranted federal infiltration into every level of local authority, even down to canine administration, and concluded that the "very threat" of executive action to enforce the civil rights laws "could alter the conduct of local policy makers," 481 F.Supp. at 1269. The Court did not consider whether the fourteenth amendment itself was not designed to affect local policy. Instead, the court seemed to assume that local policy should be insulated from federal law, at least when that arm of the federal government constitutionally charged with enforcing the law in fact seeks to enforce it.
 There is, however, no authority for the district court's dire pronouncements. Even in its most solicitous affirmance of local autonomy, the Supreme Court, in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), did not rule that state and local insulation from federal law extended to freedom from the application of the fourteenth amendment. 426 U.S. at 852 n.17, 96 S.Ct. at 2474 n.17. Subsequently, in Fitzpatrick v. Bitzer, 427 U.S. 445, 453 n.9, 46 S.Ct. 2666, 2670 n.9, 49 L.Ed.2d 614, a unanimous Supreme Court made clear that National League of Cities did not insulate local government from the fourteenth amendment. This court in Usery v. Allegheny County Institution Dist., 544 F.2d 148 (3d Cir. 1976), held that under no construction does the 10th amendment limit the fourteenth. See 544 F.2d at 154-56.
 The fourteenth amendment and the civil rights statutes present the threat to local authority. The Executive's injunctive action merely compounds, or perhaps makes good, that threat. It should, moreover, be emphasized that the district court's federalism discussion was, by that court's admission, dicta. See 482 F.Supp. at 1267. The court based its holding that the executive lacked standing on the 4th circuit's Solomon decision, and on the 9th circuit's parallel holding in United States v. Mattson, 600 F.2d 1295 (9th Cir. 1979). The district court rendered its decision almost two months before this circuit announced its en banc decision in Halderman. The district judge recognized the decisions of other circuits did not bind him. "Nevertheless, in the absence of contrary authority from the Supreme Court or from the Court of Appeals for the Third Circuit, the decisions of other courts of appeals are entitled to careful consideration, and are not to be lightly ignored" 482 F.Supp. at 1256 n.7. That contrary authority was forthcoming in Halderman, in which this court unequivocally rejected Solomon.[26] The very basis of the district court's holding on this issue is therefore undercut by a subsequent en banc decision of this court, which the panel members have brazenly ignored.
 VIII. SEPARATION OF POWERS
 Separation of powers afforded a second ground for the district court's bewailing of nonstatutory executive activity. Because Congress had thrice declined to grant the Attorney General explicit authority to seek an injunction, the district court concluded it must therefore have meant to prohibit such an action. For the Executive nonetheless to resort to the courts would thus represent an abuse of executive power. There are several flaws in this argument. First, as Judge Frankel observed in Brand Jewelers, and as the Supreme Court held in United States v. California, congressional failure explicitly to approve executive action does not equal congressional prohibition.[27]
 Second, Supreme Court precedent provides that the Executive has implicit statutory authority to seek an injunction to fill in the remedial interstices of a general statutory scheme. Moreover, 28 U.S.C. § 518 has been construed to confer explicit statutory authority, in the absence of a clear congressional prohibition, to initiate suits.
 Third, in this Circuit, the United States would have standing to participate in this action as plaintiff-intervenor. See Halderman v. Pennhurst, supra. The United States would also have authority fully to conduct the suit, so long as the Attorney General's discretion did not prejudice the interests of the private plaintiffs an unlikely circumstance in this case. See Brawer v. Horowitz, supra.[28] Any greater "threat" executive initiation of suits poses to congressional prerogative is therefore rather ethereal.
 Fourth, while neither the Supreme Court nor, with the exception of the Southern District of New York in Brand Jewelers, the lower federal courts, have squarely held the fourteenth amendment affords the Executive nonstatutory standing, all courts which have considered the question have held the commerce clause confers nonstatutory authority to sue to remove obstructions and burdens on interstate commerce. Neither the Supreme Court nor the federal courts perceived a threat to separation of powers in the Attorney General's suit to enforce the commerce clause. To the contrary, they saw the suit as implementing the constitutional scheme that the Executive enforce the laws. The government has alleged in its complaint in this case that the practices of Philadelphia police and city officials impose burdens on interstate commerce.[29] The government has had no opportunity to demonstrate the interstate commerce impact, and while a trial on the merits may fail to substantiate that claim, the claim itself afforded standing to the Attorney General.
 Fifth, as this court recognized in Halderman, executive action to secure an injunction is by its nature not an overweening exercise of power. A suit for an injunction is not a naked exercise of executive authority. Unlike the steel seizure in Youngstown Sheet & Tube, the Executive can do nothing here without the concurrence of the federal judiciary. And, because the United States is in effect suing as class representative for the citizens of Philadelphia, the Executive is entitled to no more relief than would be accorded the class members. Cf. Pasadena City Bd. of Ed. v. Spangler, 427 U.S. 424, 431, 96 S.Ct. 2697, 2702, 49 L.Ed.2d 599 (1976).
 Sixth, despite its fear that this action would violate separation of powers, the district court failed to articulate a congressional purpose or intent that the Executive's nonstatutory action would undermine. What are the identifiable congressional interests this action threatens? Congress cannot intend to insulate defendants from enforcement of the fourteenth amendment. At most, Congress might prefer that Justice Department energies and resources be expended in some other way. Congress has not so declared, however, and were it to announce such an intent, an attempt to enforce it might itself implicate separation of powers. Cf. Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). While the Executive may not decline to follow a congressional mandate within its proper legislative competence, see National Treasury Employees v. Nixon, 492 F.2d 587 (D.C.Cir.1974) (writ of mandamus lies for Executive's failure to grant pay adjustments required by act of Congress), it is questionable, to say the least, whether Congress may compel the Executive not to enforce the fourteenth amendment or the commerce clause. The Executive's Article II § 3 duty to enforce the laws may override certain congressionally imposed limitations on executive authority. But in any event, because Congress has not here attempted to forbid the Executive from carrying out its constitutional obligations, the question whether such an endeavor would violate separation of powers need not be reached.
 Finally, the general problem of suits by the Executive to protect the public welfare should be confronted. While the potential of unbridled executive initiation of suits in the "national interest" understandably may evoke visceral fears of executive power run rampant, careful analysis of the Attorney General's action in this case reveals those fears to be baseless. It is true that phrases like "the public welfare," "the national interest," and "cases in which the United States is interested," can have a formless, and perhaps dangerously expansive quality.[30] Before any court upholds the exercise of executive resort to it without explicit statutory standing, however, the court should determine what kind of right the Executive is seeking to enforce. Is the Executive endeavoring to protect its contractual and proprietary rights? To fill in the remedial interstices of a statutory scheme? To enforce a judicially recognized constitutional right?[31] Or is the Executive instead attempting to create a new right that may conflict with statutory or judicial precedent? When, as here, the Attorney General can substantiate the "national interest" and "public welfare" by reference to clearly articulated legislative policies or judicial precedent, the danger of untoward exercise of executive power is fanciful. Thus viewed, this case does not pose a threat of limitless definition of executive authority to bring suit. In this action, the Attorney General seeks to enjoin the pattern or practice of police brutality in Philadelphia. The Attorney General can point to at least four statutes specifically enacted to prohibit concerted and official deprivations of civil rights by physical abuse, 42 U.S.C. §§ 1983 and 1985 and 18 U.S.C. §§ 241 and 242. In addition, the Attorney General has invoked a host of other statutes guaranteeing civil rights, as well as the fourteenth amendment. Thus, this action does not involve the creation of new rights conflicting with legislative and judicial precedent in the "national interest." Rather, it falls comfortably into the category of decisions upholding nonspecific statutory authority to supply a new remedy for an established scheme of rights.
 IX. CORT V. ASH DOES NOT LIMIT THE ATTORNEY GENERAL'S AUTHORITY TO SUE
 The panel opinion discusses at length the four factors set forth in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for inferring a private cause of action from the existence of a federal regulatory scheme, and concludes that each factor weighs against permitting the United States to bring this suit. For a number of reasons the panel opinion is widely off target.
 The policy underlying Cort v. Ash could not have less application to this case. There, the Supreme Court was concerned with limiting the expansion of the activities of private attorneys-general. It is one thing to perceive no legislative intent to supplement the caseloads (and incomes) of private lawyers, and quite another to hold that the United States Attorney General, whose duty it is to enforce the laws, may not bring an action. Cort v. Ash defined the scope of a private attorney general's ability to enforce statutory rights; it has nothing to do with the Attorney General's authority.
 Another fundamental defect in the panel's reasoning is the assumption that a private cause of action must here be implied. The plain fact is that express private civil causes of action for violation of civil rights have been on the statute books since the late 1860's. There is no need to imply them. It is on behalf of private persons within the zone of interest of those very statutes that the United States brings this lawsuit. Obviously the United States is not protected by the fourteenth amendment, by 42 U.S.C. § 1983, or indeed by those parts of the 1870's Civil Rights Acts which in codification were distributed to the criminal code. Equally obviously, Congress has provided for declaratory and injunctive relief by or on behalf of those who are protected by the fourteenth amendment and the Civil Rights Acts. The issue is not whether a cause of action may be implied, but whether the United States is an appropriate plaintiff to plead the cause of action which Congress expressly provided. Thus the panel's conclusion (slip opinion Part III-A) that the United States is not a party in the "class for whose especial benefit the statute was enacted" is a total irrelevancy. Moreover, its conclusion (Part III-B) that there is no legislative indication either to create a remedy or to deny one is simply wrong, because it ignores the express remedies which were created. The panel opinion's lengthy discussion of Cort v. Ash is an elaborate straw man, designed to divert attention from the real issue of executive authority to act as an effective class representative.
 But, although the discussion of Cort v. Ash is a diversionary tactic, it is in the discussion of the third and fourth factors of the Cort v. Ash test that the essential Calhounism of the panel opinion can be seen most clearly.[32] The panel concludes in Part III-C that the Attorney General's suit is inconsistent with the underlying purposes of the legislative scheme the fourteenth amendment and the Civil Rights Acts observing:
 We think the underlying purposes of the legislative scheme are threefold: to permit the victims of constitutional violations to obtain redress, to provide for federal criminal prosecutions of serious constitutional violations when state criminal proceedings are ineffective for the purpose of deterring violations, and to strike an appropriate balance between the protection of individual rights from state infringement and protection of state and local governments from unnecessary federal interference. Permitting this action to proceed would upset that balance and therefore would be inconsistent with the underlying purposes of the statutory scheme.
 At 198 (emphasis supplied). Whatever else the fourteenth amendment and the Civil Rights Acts protect, they do not protect state and local governments from federal interference. Quite the contrary. Their very purpose is such interference. The panel's discussion in Part III-D of the fourth Cort v. Ash factor, whether the cause of action is one traditionally relegated to state law, is even further afield:
 The Attorney General argues that the Federal government has a central role in protecting individuals from violations of the Constitution. This argument is facially appealing because the protection of federal rights clearly is a federal concern. However, the argument blurs the distinction between the roles of the federal courts, the federal legislature, and the federal executive. It also ignores the reverse side of the same coin: this lawsuit represents an attempt by the federal executive to intervene on a grand scale in the workings of a local government, an area that is manifestly the concern of the states and not the federal government. Federal courts must be "alert to adjust their remedies" to grant relief for invasions of federally protected rights. Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), but they are equally bound to give proper recognition to the principles of federalism that underlie the very structure of the Constitution, from which the federal courts and the federal Executive alike derive their authority.
 At 198 (emphasis supplied). At least here the panel concedes, grudgingly, that the protection of federal rights is a federal concern. Not, apparently, a concern of the federal Executive, however. Somehow if the Attorney General asks a federal court to give the same declaratory or injunctive relief that it plainly is authorized to give in a suit by private parties, the pillars of the republic will be so shaken that "the very structure of the constitution" will be endangered. This sort of hyperbole has been often enough heard in Senate filibusters.[33] It has not been taken seriously there, except as a filibustering tactic, since Webster's reply to Hayne in 1829,[34] though it has often since been effective in delaying legislation. That it should surface in an opinion of a court that once had a reputation for deep interest in the protection of civil rights is astounding. As noted in Part VII above, the fourteenth amendment and the Civil Rights Acts are what intervene in the workings of local government. They were intended to intervene. The relief which the federal Executive seeks is nothing more than the fourteenth amendment and the Civil Rights Acts require if what is alleged in the complaint is true.
 CONCLUSION
 I would grant the petition for rehearing.
 Judges Higginbotham and Sloviter, for the reasons expressed in this opinion, would also grant rehearing.
 Because Chief Judge Seitz believes that Judge Gibbons' opinion demonstrates the existence of issues worthy of in banc consideration, he joins his dissent from the denial of the petition for rehearing in banc.
 
 
 [1]
 We think it likely, however, that a more stringent test should be employed when a party claims an implied right to an injunction, which is an extraordinary remedy, than when he seeks damages. "(A)n essential prerequisite for traditional equity jurisdiction" is the inadequacy of available legal remedies and the existence of irreparable injury. United States v. American Friends Service Comm., 419 U.S. 7, 11, 95 S.Ct. 13, 15, 42 L.Ed.2d 7 (1974) (per curiam)
 
 
 [2]
 The Court in Transamerica noted that the statute in question provided for criminal penalties, SEC injunctive actions, and SEC administrative sanctions. In view of those express provisions, the Court found it "highly improbable that 'Congress absentmindedly forgot to mention an intended private action.' " 444 U.S. at 20, 99 S.Ct. at 247 (quoting Cannon v. University of Chicago, 441 U.S. at 742, 99 S.Ct. at 1981 (Powell, J., dissenting)). We find that observation equally applicable to the injunctive action asserted here
 
 
 [3]
 As an inferior court in the federal hierarchy, we are, of course, compelled to apply the law announced by the Supreme Court as we find it on the date of our decision. Cf. Bradley v. Richmond School Board, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) (applying a statute enacted while the case was pending on appeal)
 
 
 [4]
 The petitioners in Wyandotte did not dispute the government's right to proceed in rem against the vessel and its cargo, but the proceeds of the sale were only $85,000 while the costs of removal were $3,081,000. 389 U.S. at 200 n.12, 88 S.Ct. at 385
 
 
 [5]
 Moreover, we agree with the appellees that comparing a "single civil action" to multiple criminal prosecutions is an illusion. The "single civil action" contemplated would involve perhaps scores of "minitrials," see, e. g., Rizzo v. Goode, 423 U.S. 362, 367, 96 S.Ct. 598, 602, 46 L.Ed.2d 561 (1976), and each violation of any injunction that might be entered would itself require a full scale trial. It may be that the "single civil action" would be far more cumbersome and "inadequate" than criminal prosecutions
 
 
 [6]
 We state this as an assumption both because of the greater burden imposed on a plaintiff who invokes equity jurisdiction, see note 1 supra, and because recent Supreme Court decisions have cast doubt on the continued vitality of some of the four Cort v. Ash factors. For example, in Touche Ross, 442 U.S. at 575-76, 99 S.Ct. at 2489, the Court held:
 We need not reach the merits of the arguments concerning the "necessity" of implying a private remedy and the proper forum for enforcement of the rights asserted ..., for we believe such inquiries have little relevance to the decision of this case. It is true that in Cort v. Ash, the Court set forth four factors that it considered "relevant" in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in Cort the language and focus of the statute, its legislative history, and its purpose, see 422 U.S., at 78, [95 S.Ct. at 2087] are ones traditionally relied upon in determining legislative intent.
 
 
 [7]
 The government's assertion of a "duty" to prevent violations of the Constitution simply cannot withstand critical analysis. The argument lacks any foundation in the language, structure, or history of the predicate statutes. It fails to identify any person or class of persons to whom the asserted duty is owed or what rights those persons would have if the United States failed to act. It also overlooks the Supreme Court's critical evaluation of a similar assertion in a related context:
 Respondents posit a constitutional "duty" on the part of petitioners (and a corresponding "right" of the citizens of Philadelphia) to "eliminate" future police misconduct; a "default" of that affirmative duty being shown by the statistical pattern, the District Court is empowered to act in petitioners' stead and take whatever preventive measures are necessary, within its discretion, to secure the "right" at issue. Such reasoning, however, blurs accepted usages and meanings in the English language in a way which would be quite inconsistent with the words Congress chose in (42 U.S.C.) § 1983. We have never subscribed to these amorphous propositions, and we decline to do so now.
 Rizzo v. Goode, 423 U.S. 362, 376, 96 S.Ct. 598, 606, 46 L.Ed.2d 561 (1976).
 
 
 [8]
 See note 2 supra
 
 
 [9]
 Senator Saltonstall, for example, argued against permitting "direct (federal) interference with home rule, local administration, and State administration." 103 Cong.Rec. 12541 (1957). See also id. at 12530 (remarks of Senator Kefauver); id. at 12549-50 (remarks of Senator Hickenlooper); id. at 12553-54 (remarks of Senator Mundt); id. at 12564 (statement by Senator Bricker)
 
 
 [10]
 Id. at 12565
 
 
 [11]
 Id. at 16112-13
 
 
 [12]
 See, e. g., United States v. Ellis, 595 F.2d 154 (3d Cir.), cert. denied, 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979)
 
 
 [13]
 106 Cong.Rec. 6308 (1960) (remarks of Congressman Celler). Unlike the 1957 version of Part III, the Celler proposal would not have amended any existing civil rights statute. It would have authorized the Attorney General, upon receipt of a signed complaint from any person alleging a denial or a threatened denial of equal protection of the laws because of race, color, religion, or national origin, to certify that in his judgment the complainant was unable to seek effective legal protection, and to institute a civil action for preventive relief in the name of the United States. Id
 
 
 [14]
 Id. at 5175 (remarks of Senator Keating). See also id. at 5153 (remarks of Senator Church); id. at 5177 (remarks of Senator Case)
 
 
 [15]
 Id. at 5084 (remarks of Senator Stennis)
 
 
 [16]
 Id. at 5105. Attorney General William Rogers had stated his opposition to the Celler proposal in testimony before a House subcommittee. Civil Rights: Hearings on Miscellaneous Bills Regarding the Civil Rights of Persons within the Jurisdiction of the United States Before Subcomm. No. 5 of the House Comm. on the Judiciary, 86th Cong., 1st Sess., Ser. No. 5 at 222-25 (1959)
 
 
 [17]
 See 120 Cong.Rec. 41735-45 (1974)
 
 
 [18]
 106 Cong.Rec. 5160
 
 
 [19]
 Id. at 5182
 
 
 [20]
 Pub.L.No. 86-449, 74 Stat. 86 (1960)
 
 
 [21]
 See parts II and III B, supra. It is not surprising that Congress in 1866, 1870, 1871, 1957, 1960, 1964, and 1968 did not explicitly declare that the remedies it had created were equally effective substitutes for recovery directly under the Constitution, because the "constitutional tort" theory was not announced by the Supreme Court until Bivens was decided in 1971. Moreover, we note that the Court in Carlson cautioned that Congress need not recite any specific "magic words" to make an explicit declaration; rather, "our inquiry at this step in the analysis is whether Congress has indicated that it intends the statutory remedy to replace, rather than to complement, the Bivens remedy." 446 U.S. at 19 n.5, 100 S.Ct. at 1472 n.5
 
 
 [22]
 The same Attorney General who filed this civil action, speaking through Assistant Attorney General Days, advocated passage of the Civil Rights of Institutionalized Persons Act. See Civil Rights for Institutionalized Persons: Hearings on H.R. 2439 and H.R. 5791 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 95th Cong., 1st Sess. 3 (1977) (testimony of Hon. Drew S. Days, III). The act authorizes the Attorney General to institute civil actions to redress systematic deprivations of the rights of institutionalized persons. The history of this legislation both demonstrates that no member of Congress believed that the Justice Department already possessed the broad implied authority that it now claims and emphasizes the fact that Congress frequently has acted to give the Department explicit authority to engage in limited areas of civil rights litigation:
 In the past, Congress has not hesitated to give the Attorney General statutory authority to engage in litigation to secure citizens' basic constitutional rights where evidence has tended to show a widespread denial of such rights. In seeking to remedy discrimination in voting, public accommodations, employment, and housing, Congress has authorized the Attorney General to commence litigation to correct a "pattern or practice" of unlawful conduct in such areas. 39
 
 
 [39]
 E. g. Title VI of the Civil Rights Act of 1960, 42 U.S.C. 1971(e) (voting); title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000a-5(a) (employment); title II of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5(a) (public accommodations); title VIII of the Civil Rights Act of 1968, 42 U.S.C. 3613 (housing)
 H.R.Rep.No. 80, 96th Cong., 1st Sess. 15 & n. 39 (1979); see also S.Rep.No. 416, 96th Cong., 1st Sess. 22 & n. 64 (1979), reprinted in (1980) U.S.Code Cong. & Ad.News, 1936, 1952 & 1953 n. 64. Obviously, if the Attorney General's theory is correct today, it would have been unnecessary to request specific authority to bring civil actions for voting in 1960, employment and public accommodations in 1964, housing in 1968, and institutionalized persons in 1980.
 
 
 [23]
 See, e. g., United States v. City of Philadelphia, 482 F.Supp. 1248, 1265-66 (E.D.Pa.1979); United States v. Solomon, 419 F.Supp. 358, 365-68 (D.Md.1976), aff'd, 563 F.2d 1121 (4th Cir. 1977); id., 563 F.2d at 1128; United States v. School District of Ferndale, Michigan, 400 F.Supp. 1122, 1129-30 (E.D.Mich.1975), aff'd in pertinent part, 577 F.2d 1339 (6th Cir. 1978). See also 85 Harv.L.Rev. 1566, 1576-79 (1972); 84 Harv.L.Rev. 1930 (1971); 37 Brooklyn L.Rev. 426 (1971); 17 Wayne L.Rev. 1287 (1971)
 
 
 [24]
 Counsel for the government stipulated at oral argument that it now relies on only two statutes, the State and Local Fiscal Assistance Act of 1972, as amended (the "Revenue Sharing Act"), and the Omnibus Crime Control and Safe Streets Act of 1968, as amended. Transcript of oral argument 25-26
 The Revenue Sharing Act, as amended, 31 U.S.C. § 1242, provides in part:
 (a)(1) In general. No person in the United States shall, on the ground of race, color, national origin, or sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity of a State government or unit of local government, which government or unit receives funds made available under subchapter I of this chapter....
 (g) Whenever the Attorney General has reason to believe that a State government or a unit of local government has engaged or is engaging in a pattern or practice in violation of the provisions of this section, the Attorney General may bring a civil action in an appropriate United States district court. Such court may grant as relief any temporary restraining order, preliminary or permanent injunction, or other order, as necessary or appropriate to insure the full enjoyment of the rights described in this section, including the suspension, termination, or repayment of funds made available under subchapter I of this chapter, or placing any further payments under subchapter I of this chapter in escrow pending the outcome of the litigation.
 The nondiscrimination provisions of the Crime Control Act, as amended, 42 U.S.C. § 3789d(c)(1), (3), are substantively identical to those of the Revenue Sharing Act for purposes of this appeal.
 
 
 [25]
 Appellees moved for dismissal under Fed.R.Civ.P. 12(b), but the district court treated the motion as seeking judgment on the pleadings under Rule 12(c) because appellees had previously answered the complaint. 482 F.Supp. at 1275 & n.2
 
 
 [26]
 See, e. g., Rotolo v. Borough of Charleroi, 532 F.2d 920, 922-23 (3d Cir. 1976); Kauffman v. Moss, 420 F.2d 1270, 1275-76 & n.15 (3d Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); Negrich v. Hohn, 379 F.2d 213 (3d Cir. 1967)
 We are not alone in requiring civil rights complaints to be pleaded with some factual specificity. See, e. g., Cohen v. Illinois Institute of Technology, 581 F.2d 658, 663 (7th Cir. 1978), cert. denied, 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97 (1979); Anderson v. Sixth Judicial District Court, 521 F.2d 420, 420-21 (8th Cir. 1975); Albany Welfare Rights Organization Day Care Center, Inc. v. Schreck, 463 F.2d 620, 622-23 (2d Cir. 1972), cert. denied, 410 U.S. 944, 93 S.Ct. 1393, 35 L.Ed.2d 611 (1973).
 
 
 [27]
 The Crime Control Act, in the same section that authorizes the Attorney General to sue to prevent discrimination in the administration of federal funds, provides:
 (a) Nothing contained in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.
 42 U.S.C. § 3789d(a) (emphasis added).
 
 
 [28]
 We do not hold that the government's case against the City was actually frivolous or insubstantial, but only that its complaint provides an inadequate basis for us to determine whether its allegations were frivolous or serious
 
 
 [29]
 The central allegation of unlawful discrimination underlying the funding claims is as follows: "The practices, policies, and procedures set forth in paragraphs 29 through 42, insofar as they have a disparate impact upon black and Hispanic persons, have been initiated and maintained by the defendants with discriminatory intent." Complaint, P 48, App. at 32
 
 
 [30]
 The Attorney General argues on appeal that the entire Philadelphia Police Department is a "program or activity" within the meaning of the funding statutes, and that discriminatory practices occurring anywhere within the Department authorize him to seek an injunction remaking the entire Department. We cannot agree. The Attorney General's statutory authority to sue was created under the spending power given Congress by Article I, § 8 of the Constitution, and it only empowers him to see that federal funds are not expended in a discriminatory manner. Cf. Dougherty County School System v. Harris, 622 F.2d 735 (5th Cir. 1980) (termination of federal funds pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681); Board of Public Education of Taylor County, Florida v. Finch, 414 F.2d 1068 (5th Cir. 1969) (fund termination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d). The government relies heavily on the regulations promulgated under the two funding statutes, but those regulations do not support its position. 28 C.F.R. § 42.202(g) (1979) (Justice Department regulation under the Crime Control Act) defines "program or activity" as "the operations of the agency or organizational unit of government receiving or substantially benefiting from the financial assistance awarded; e. g., a police department or department of corrections." 31 C.F.R. § 51.51(i) (1980) (Revenue Sharing regulation issued by Treasury Department) is substantially identical, including the same examples. These regulations do not define "program" as the entire "agency or organizational unit," however, but as the "operations" of such an agency or unit which receive or substantially benefit from federal assistance
 
 
 [31]
 Although the individual defendants were entitled to fair notice of the nature of their alleged wrongdoing in the district court, this is true a fortiori now. The government has emphasized throughout this litigation that it was suing the named defendants in their official capacities only, and since the last Philadelphia municipal election and the advent of a new city administration there have been wholesale changes in the list of named defendants. Philadelphia Mayor Frank L. Rizzo has been replaced by Mayor William J. Green; Managing Director Hillel S. Levinson, by W. Wilson Goode; Director of Finance Irvin R. Davis, by G. Edward DeSeve; Police Commissioner Joseph F. O'Neill, by Morton B. Solomon; Deputy Police Commissioners Harry G. Fox and Morton B. Solomon, by William Devlin and Donald Gravatt; Prisons Superintendent Edmund Lyons, by David Owens; and from a list of eleven Chief Inspectors of the Philadelphia Police Department, the names of Richard Bridgeford, Joseph Golden, James Herron, Ferdinand Spiewak, Edwin S. Parker, and William Devlin have been deleted and replaced by Robert Armstrong, Francis X. O'Shea, and four unnamed successors to the positions and functions of named defendants
 
 
 [32]
 In part VI of its opinion dismissing the §§ 241 and 242 and fourteenth amendment claims, entitled "Abuse of Power in this Lawsuit," the district court strongly suggested that such purposes may lie behind the decision to bring this action, its timing, and other tactics employed. 482 F.Supp. at 1270-73
 
 
 *
 Judge Adams did not participate in the consideration of this matter
 
 
 [1]
 The court did, however, uphold the Attorney General's assertion of explicit statutory standing to prevent discrimination in the administration of federally funded programs. See infra
 
 
 [2]
 On November 24, 1832, South Carolina passed a statute making it a state crime for a federal official to take steps to enforce the Federal Tariff Law. 1 Statutes at Large of South Carolina 329 et seq
 
 
 [3]
 One might note, however, that the district court denied the government's request that it issue a protective order enjoining the police department from destroying its back files. See district court order of August 18, 1979
 
 
 [4]
 See Complaint P 33
 
 
 [5]
 See, e. g., Ahmad v. Levi, 414 F.Supp. 597 (E.D.Pa.1976) (suit against United States, newspapers, radio and television stations and the American Bar Association for collusion in furnishing foreign aid to Israel and in refusing to publicize the alleged illegality of that aid). But see Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (plurality opinion)
 
 
 [6]
 See, e. g., Johns Manville Sales Corp. v. Chicago Title & Trust Co., 261 F.Supp. 905, 908 (N.D.Ill.1966)
 Defendants also seek to have the amended complaint dismissed as being excessively prolix contrary to the "... simple, concise and direct ..." and "... short and plain statement of the claim ..." requirement of Rule 8 subsections (c)(1) and (a)(2), respectively.
 I agree with defendants. A review of the amended complaint indicates it to be anything but a simple, concise and direct, short and plain statement of the claim. It devotes 69 paragraphs and 39 pages to pleading a single count. More importantly, exhibits, many of them group exhibits, designated by consecutive letters up to and including the letter "X" are attached to and therefore part of the complaint. Most of these exhibits contain, for the most part, extraneous or at best evidentiary material....
 One might note that a fact-pleading requirement in this case would produce, with respect to the count of cover-charging alone, a 79 page submission containing over 284 paragraphs. That submission would make the Johns Manville "excessively prolix" 39-page, 69-paragraph section of the complaint seem an exercise in modest and restrained pleading.
 
 
 [7]
 One should note that neither the district court nor the panel opinion cited any authority to support a fact-pleading requirement in pattern or practice suits
 
 
 [8]
 See, e. g., Sanitary District of Chicago v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925); In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895), and cases cited infra, p 218
 
 
 [9]
 See United States v. Brand Jewelers, 318 F.Supp. 1293 (S.D.N.Y.1970)
 
 
 [10]
 See, e. g., Wyandotte Transp. Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); United States v. American Bell Telephone Co., 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888); United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888)
 
 
 [11]
 United States v. California, 332 U.S. 19, 27, 67 S.Ct. 1658, 1662, 91 L.Ed. 1889 (1946)
 
 
 [12]
 In re Debs, 158 U.S. 564, 584, 15 S.Ct. 900, 906, 39 L.Ed. 1092 (1895)
 
 
 [13]
 Section 35 of the first judiciary act, Act of Sept. 24, 1789, c. 20 § 35, 1 Stat. 92, had granted the Attorney General such authority only with respect to suits before the Supreme Court, see Hayburn's Case, 2 U.S. 408, 2 Dall. 409, 1 L.Ed. 436 (1792); 1 C. Warren, The Supreme Court in United States History (1926) 78; J. Goebel, I History of the Supreme Court: Antecedents and Beginnings (Oliver W. Holmes Devise) 562-64 (1971). In other courts, until 1870, local district attorneys appeared
 
 
 [14]
 Cf. Wyandotte Transp. Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967). The United States removed a sunken barge, and sought to recover its costs from the owner. The Rivers and Harbors Act of 1899 did not provide for that remedy, but it did impose on the barge owner a nondelegable duty to remove the sunken ship. The Supreme Court held the United States had a right of action to seek a remedy the statute did not explicitly afford because the United States was enforcing the overall statutory purpose and because, under the facts of the case, if the United States had not immediately removed the barge, no one would have. The case is often cited for the proposition that the United States has an implied statutory right of action when there is an overall statutory scheme and no other effective remedy exists. See, e. g., Note, Oil Spills & Clean Up Bills: Federal Recovery of Oil Spill Clean Up Costs, 93 Harv.L.Rev. 1761, 1765 (1980)
 
 
 [15]
 The court observed that the executive might call out the army forcibly to abate the public nuisance, but concluded that this extreme prerogative comprehended lesser measures
 (T)he existence of this right of forcible abatement is not inconsistent with nor does it destroy the right of appeal in an orderly way to the courts for a judicial determination and an exercise of their power by a writ of injunction and otherwise to accomplish the same result.... So, in the case before us, the right to use force does not exclude the right of appeal to the courts for a judicial determination and for the exercise of all their powers of prevention. 158 U.S. at 582-83, 15 S.Ct. at 905.
 
 
 [16]
 See Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)
 
 
 [17]
 United States v. California, incidentally, involved a far more direct threat to state interests than this case, for here the governing standards of state conduct have long been established, while in the offshore oil case the substantive issue was a matter of warm debate in Congress; a debate which eventually resulted in legislation. Submerged Lands Act of 1953, 67 Stat. 29, 43 U.S.C. § 1301. See Alabama v. Texas, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689 (1954)
 
 
 [18]
 United States v. Cooper Corp., 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941), decided five years before United States v. California, does not represent a step backward. That decision concerned whether § 7 of the Sherman Act afforded the United States a right of action for treble damages against a seller from whom the United States had purchased goods at allegedly monopolistic prices. The Court construed the statute to create a new federal tort action for persons within the statute's zone of interest, but concluded the United States was not a "person" within the statutory meaning. Cooper Corp. therefore has no application where the United States does not seek a specially created remedy, and does not sue in the guise of a private litigant. In City of Philadelphia, the United States does not seek damages, and it sues in the public interest
 
 
 [19]
 See generally Dixon Civil Rights in Transportation and Government Initiative, 49 U.Va.L.Rev. 205, 224-27 (1963)
 In United States v. City of Jackson, supra. Judge Wisdom found it unnecessary to hold that the United States also had direct standing under the fourteenth amendment. Judge Wisdom wrote:
 When a State, not by some sporadic act against a particular individual but by a law or pattern of conduct, takes action motivated by a policy which collides with national policy as embodied in the Constitution, the interest of the United States "to promote the interest of all" gives it standing to challenge the State in the courts. When the action of a State violative of the Fourteenth Amendment conflicts with the Commerce Clause and casts more than a shadow on the Supremacy Clause, the United States has a duty to protect the "interests of all." The courts offer the first avenue for counter-action by the Nation. Such thinking may take us down the road to recognition of Government standing to sue under the Fourteenth Amendment or under any clause of the Constitution. But this case is only a way station. The issue here is framed by the Commerce Clause. Under that clause there is authority for the United States to sue without specific congressional authorization.
 318 F.2d at 14. Two lower court decisions, United States v. Biloxi Municipal School District, 219 F.Supp. 691 (S.D.Miss.1963), and United States v. Madison County Bd. of Ed., 219 F.Supp. 60 (N.D.Ala.1963), explicitly rejected fourteenth amendment standing. The Fifth Circuit affirmed these decisions on other grounds, 326 F.2d 237 (5th Cir.), cert. denied, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964).
 
 
 [20]
 See, e. g., S. F. Lawson, Black Ballots: Voting Rights in the South, 1944-1969, 47-49, 116-139 (1976)
 
 
 [21]
 Brand Jewelers has not gone uncriticized. See, e. g., Comment, 84 Harv.L.Rev. 1930 (1971). In some respects, Brand Jewelers may go beyond its precedent, for Judge Frankel was arguably entertaining not merely a new remedy through executive suit. Because the closest applicable statute. The Consumer Credit Protection Act of 1968, governed deceptive credit practices in general, but did not address the sewer service procedure, commentators charge Judge Frankel with having created a new right. In this case, 42 U.S.C. §§ 1983 and 1985 and 18 U.S.C. §§ 241 and 242 confer a clear right to be free from police abuse. In that respect, therefore, this case is less controversial than Brand Jewelers
 
 
 [22]
 A District of Columbia Circuit decision to which the Brawer court approvingly referred, Booth v. Fletcher, 101 F.2d 676, 682 (D.C.Cir.1938), interpreted the predecessor 28 U.S.C. §§ 517, 518 to hold that once the Attorney General may intervene,
 (t)he law contemplates that consistent with the proper interests of private litigants and, so far as concerns the interests of the United States he shall have full control of the prosecution or defense of the case.
 In United States v. Rice, 421 F.Supp. 871 (E.D.Ill.1976), the district court upheld the United States' nonstatutory suit to enjoin a state criminal prosecution of a defendant to whom the Federal government had granted immunity.
 
 
 [23]
 If the Halderman and Brawer opinions authorizing the United States to intervene in and conduct a lawsuit by a private party are left unimpaired, the power of the Executive Branch to prevent future violations of civil rights may not be seriously diminished, since it is quite likely that cooperative private plaintiffs can be found. Probably, however, the judges in the panel majority intended, despite Halderman and Brawer, to close that door as well. If they did not, perhaps the panel opinion stands for nothing more than that the Executive Branch must, like some ambulance chaser, go out and find a private plaintiff in whose lawsuit it can intervene before it can use the civil processes of the federal courts to prevent threatened future violations of the fourteenth amendment. If Halderman and Brawer are distinguishable on this ground, the distinction is ludicrous. If they are not so distinguishable, the cases are controlling in this Circuit. See Internal Operating Procedures for the Third Circuit, Chapter VII C
 
 
 [24]
 Cf. Pasadena City Bd. of Ed. v. Spangler, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), in which the Supreme Court held the United States, permitted by statute to intervene in a school desegregation action, was an adequate class representative for the plaintiffs, even though the individual plaintiffs had not, in fact, been certified under Rule 23, and by the time the suit reached the Supreme Court, lacked standing because all had graduated. "Except for the intervention of the United States ... (the) case would clearly be moot." 427 U.S. at 430, 96 S.Ct. at 2702. Justice Rehnquist held the statute authorizing the United States' intervention implicitly permitted the United States "to continue as a party plaintiff ... despite the disappearance of the original plaintiffs and the absence of any class certification...." Id. at 431, 96 S.Ct. at 2702
 While the Spangler Court rested its holding that the United States was an adequate class representative for the plaintiffs' civil rights action on an interpretation of the statute permitting intervention, Spangler may also afford authority for the proposition that once the United States may intervene, it may also continue the suit as an effective class representative inasmuch as the United States' intervention serves the public interest and fosters the general statutory or constitutional objective of enforcing the fourteenth amendment and congressional enactments based on it.
 
 
 [25]
 The district judge combined his discussion of federalism with his treatment of separation of powers, collapsing and confusing the two. The two concerns are, however, quite distinct. The subordination of state to federal sovereignty has nothing to do with the allocation of power among coordinate branches of the federal government. As Thayer's seminal article, The Origin and Scope of the American Doctrine of Constitutional Law, 7 Harv.L.Rev. 129 (1893), points out, in one of its less-quoted passages:
 But at last the convention, rejecting all these, settled down upon the common expedients of two legislative houses, to be a check upon each other, and of an executive revision and veto, qualified by the legislative power of reconsideration and enactment by a majority of two-thirds; upon these expedients, and upon the declaration that the constitution, and constitutional laws and treaties, shall be the supreme law of the land, and shall bind the judges of the several States. This provision, as the phrasing of it indicates, was inserted with an eye to secure the authority of the general government as against the States, i. e., as an essential feature of any efficient Federal system, and not with direct reference to the other departments of the government of the United States itself. The first form of it was that "legislative Acts of the United States, and treaties, are the supreme law of the respective States, and bind the judges there as against their own laws."
 Id. at 137 n.1.
 
 
 [26]
 Moreover, Congress has since overruled Solomon. Civil Rights of Institutionalized Persons Act, Pub.L.No.96-247, § 3, 94 Stat. 350 (1980)
 
 
 [27]
 See also United States v. Marion City School Dist., 625 F.2d 607, 611 (5th Cir. 1980). Defendants had argued the United States had no standing to sue a racially discriminatory school for a breach of a federal funding contract because Congress had "deliberately nullified" a statutory contract claim. The unanimous panel rejected this contention, holding "it is well established that the government's right to sue to enforce its contracts exists as a matter of federal common law, without necessity of a statute. E. g., United States v. Tingey, 30 U.S. (5 Pet.) 113, 127-28 (Story, J.) (calling the right 'an incident to the general right of sovereignty').... Congress may nullify the right, but as the Supreme Court has repeatedly emphasized, courts are entitled to conclude that Congress has done so only if the evidence of Congress' intent is extremely, even unmistakably, clear."
 
 
 [28]
 Judge Aldisert was not only correct in recognizing in Brawer v. Horowitz that the Department of Justice could undertake to protect private rights in which the United States had a governmental interest; he was acting consistently with historical precedent antedating the Department of Justice Act by 30 years. In 1841, when Daniel Webster was Secretary of State, he directed the United States Attorney to appear on behalf of Alexander McLeod, a Canadian militiaman indicted by the State of New York for murder in the death of a New Yorker who was running guns to the Canadian insurrectionists of 1837. The United States was interested in McLeod's defense because his prosecution was a matter interfering with Webster's efforts to negotiate a treaty settling a boundary dispute. Webster not only arranged for the United States to defend McLeod, but to guard the courthouse with federal troops to prevent violence. See People v. McLeod, 25 Wend. 483 (N.Y.1841), I. H. Bartlett, Daniel Webster, 178, 191, 192 (1978). Congress was not the least offended. Indeed shortly after the McLeod incident ended, Congress enacted the Act of Aug. 29, 1842, 5 Stat. 539-40, now found at 28 U.S.C. § 2241(c)(4), which, had it been available to Webster, would have permitted the United States to abort the prosecution entirely by removing the prisoner from New York
 
 
 [29]
 In the United States' Third Reply to Defendants' First Set of Interrogatories, at 171-74, the government includes the names of over fifty out of towners who filed police complaints between 1972 and 1978, alleging harassment, verbal and physical abuse, false arrest, illegal searches, and shootings at the hands of the Philadelphia police force
 
 
 [30]
 Is the "national interest" any policy the incumbent Executive seeks to promote? And if so, may the Attorney General attempt to enforce it by resort to the courts despite the absence of any supporting legislation or judicial decision? If, for example, the Executive interprets the fourteenth amendment to prohibit racial quotas, may the Attorney General sue to enjoin a municipality's minority set-aside program for civil service employees? Or if the Executive concludes that trenchant media critiques of foreign policy undermine national security, may the Attorney General sue to enjoin publication of such unflattering commentaries?
 
 
 [31]
 Or to protect the integrity of the judiciary, see United States v. Shipp, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319 (1906); 214 U.S. 386 (1909); 215 U.S. 580 (1909) (upholding nonstatutory information filed against defendants for criminal contempt of the Supreme Court when the Court was considering habeas corpus petition of state prisoner and defendants instigated prisoner's lynching). See also In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890) (upholding nonstatutory exercise of executive power without contemporaneous judicial approval to dispatch federal marshall to protect federal judge riding circuit)
 
 
 [32]
 See John C. Calhoun, Disquisition on Government, in 1 The Works of John C. Calhoun, 52-59 (R.K. Cralle ed. 1854)
 
 
 [33]
 Among others, from Senator Ervin, whom the panel celebrates as a "leading constitutional scholar." Slip opinion 17
 
 
 [34]
 6 Writings and Speeches of Daniel Webster, 124-148 (1903)